[No. A112313. First Dist., Div. Three. June 28, 2007.]

JOHN J. TENNISON, Plaintiff and Appellant, v.
CALIFORNIA VICTIM COMPENSATION AND GOVERNMENT
CLAIMS BOARD, Defendant and Respondent.

Counsel

Keker & Van Nest, Elliot R. Peters, Daniel Purcell and Steven P. Ragland for Plaintiff and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Michael P. Farrell and David Andrew Eldridge, Deputy Attorneys General, for Defendant and Respondent.

Opinion

**PARRILLI, J.**—In this case we hold that a finding of factual innocence under Penal Code section 851.8 does not have collateral estoppel effect in later proceedings before the California Victim Compensation and Government Claims Board (the Board) pursuant to Penal Code section 4900 et seq.[1] under the circumstances presented here. Appellant, John J. Tennison, petitioned the superior court for a writ of mandate after the Board denied him compensation benefits. The superior court denied the requested relief, and we affirm that judgment.

## FACTUAL OUTLINE & PROCEDURAL BACKGROUND

I *State Court Proceedings*

In December 1989, Tennison, then 17 years old, was arrested for the murder of Roderick Shannon (also known as "Cooley") on August 19, 1989. Shannon was beaten by a group of young men, then shot to death with a 12-gauge shotgun in the parking lot of the Super Fair Market, located on the corner of Leland and Rutland Streets in San Francisco. After a car chase, which ended when Shannon crashed his vehicle, Shannon fled on foot, but his pursuers chased and cornered him at the Super Fair Market. The murder occurred against a backdrop of ongoing violent confrontations between youths from the San Francisco neighborhoods of Sunnydale and Hunters Point. Several days before Shannon's murder, two Hunters Point youths were murdered in a driveby shooting. Shannon was from Sunnydale.

It was determined Tennison would be tried as an adult, and in an information filed in June 1990, he was charged with the first degree murder of Shannon, as well as conspiracy to commit assault with force likely to

---

[1] Further statutory references are to the Penal Code unless otherwise noted.

produce great bodily injury and murder. The information also alleged Tennison knew another principal was personally armed with a shotgun. The prosecution's theory was that a number of young men, including Tennison, chased Shannon and caught him as he tried to climb a fence while fleeing. The young men pulled Shannon back into the Super Fair parking lot. Anton Goff (also known as "Sodapop") retrieved a shotgun from a vehicle. Tennison held Shannon while Goff shot him. Tennison's case was consolidated with Goff's for trial.

At trial, the main evidence presented connecting Tennison to the killing was the identification testimony of two young girls, Masina Fauolo, who turned 12 years old the day after the shooting, and Pauline Maluina, who was 14 years old at the time of the shooting. The girls testified Masina had been driving around in a stolen car with Pauline as her passenger. They saw a car chase begin, and Masina realized the car being chased belonged to a good friend of hers. They followed the chase and saw a person get out of the car that crashed. Masina recognized him as her friend Shannon. Both girls ran after Shannon to the Super Fair parking lot, where they witnessed the shooting.

On October 3, 1990, the jury found Tennison guilty on the first degree murder charge and also found true the allegation he knew Goff was personally armed with a shotgun. Tennison's motion for a new trial was heard in May 1991, and was based principally on newly discovered evidence obtained by defense counsel of the confession of Lovinsky Ricard (also known as "LaVinsta"). Ricard confessed to police in November 1990 that he was the person who shot Shannon, and Tennison was not present at the scene of the shooting. On June 20, 1991, the trial court denied the motion for a new trial because Ricard's confession was untrustworthy and he was not shown to be unavailable.[2] Thereafter, Tennison received a sentence of 25 years to life on the murder charge, with sentences stayed on the conspiracy charge and arming allegation. All Tennison's state court appeals and petitions for writs of habeas corpus were rejected, and his state court remedies were finally exhausted after the California Supreme Court denied a second habeas corpus petition in May 2002.

## II Federal Proceedings

In August 2002, Tennison filed an amended habeas corpus petition in federal district court. Tennison argued for habeas corpus relief on four grounds: (1) violation of due process based on his actual innocence and on

[2] Ultimately, in September 2003, Ricard recanted this confession, saying he had lied to the police to help his friends. (See, *post*, at p. 1189.)

the state's failure to properly address evidence of his actual innocence; (2) *Brady*[3] violations by the prosecution; (3) ineffective assistance of counsel; (4) cumulative error. In a 103-page order filed on August 26, 2003, the federal district court granted Tennison's amended petition for habeas corpus. The court granted the petition based on violations of *Brady* and its progeny, and did not address Tennison's actual innocence claim.

The federal court concluded that five pieces of evidence withheld by the prosecution qualified as *Brady* material. First, the prosecution did not inform defense counsel that Homicide Inspector Hendrix requested and received approval for $2,500 from the Secret Witness Program to encourage witnesses to come forward in the Shannon murder case, and the prosecution was unable to explain who received the money. Second, the prosecution failed to disclose that Pauline Maluina, one of the two identification witnesses, took an inconclusive polygraph examination in April 1990, in which she was asked whether she saw the shooting. Third, the prosecution suppressed a statement given to police by Chante Smith in January 1990. In that statement Smith told police Ricard shot Shannon, provided names of other individuals present at the shooting, and described several of the cars involved in the car chase. In a posttrial interview in July 1992 in the presence of defense counsel and prosecutors, Smith explained she told police in 1990 she had heard details of the murder from someone else, but did not admit to being an eyewitness because she did not want to go to court. Fourth, the prosecution failed to disclose a videotaped interview with Luther Blue. Police interviewed Blue twice after his name came up during the investigation into the Shannon murder. The prosecution disclosed the second interview held on February 14, 1990, but not the videotaped interview of February 9, 1990. In questioning Blue in the earlier interview, the investigating officer alluded to information that contradicted the testimony of Masina and Pauline on which the prosecution relied at trial. Fifth, the prosecution failed to produce the videotape of Ricard's November 1990 confession until the last day of testimony on the motion for a new trial, more than six months later. Regarding the cumulative effect of these five *Brady* violations, the federal court concluded: "Given the weakness of the prosecution's case against Tennison, . . . there is a reasonable probability that any one of [them] . . . could have caused the result of Tennison's . . . trial to have been different. It follows that had the prosecution timely turned over to [defense counsel] all the withheld evidence, there is a stronger reasonable probability of a different result." The federal court vacated Tennison's conviction and ordered the state to release him from custody or reinstate criminal proceedings.

---

[3] *Brady v. Maryland* (1963) 373 U.S. 83, 87 [10 L.Ed.2d 215, 83 S.Ct. 1194] (suppression by the prosecution of evidence favorable to the accused violates due process where evidence is material to guilt or punishment).

On August 28, 2003, counsel for Tennison filed a joint stipulation for his immediate release from custody. An order entered by the federal court the same day ordered the state to release Tennison on his own recognizance. On the next day, the San Francisco District Attorney's Office announced it would not retry Tennison for Shannon's murder.

III *Section 851.8 Proceedings*[4]

On October 7, 2003, 13 years after the jury returned the guilty verdict against him, Tennison filed a notice of motion and motion pursuant to section 851.8 for an order declaring him factually innocent of Shannon's murder. He also requested sealing and destruction of all records of his arrest relating to the offense, pursuant to section 851.8. On October 22, 2003, San Francisco District Attorney Hallinan filed a response to Tennison's motion, which stated in its entirety: "The People concur that Petitioner is factually innocent pursuant to Penal Code section 851.8."

On October 27, 2003, the San Francisco Superior Court entered an order prepared by Tennison's counsel for a declaration of factual innocence. The order recited in part as follows: "On August 28, 2003, the California Attorney General voluntarily stipulated to Tennison's immediate release on his own recognizance . . . ." After the federal court granted his habeas corpus petition, on September 2, 2003, "the California Attorney General's office informed Tennison's counsel that the State would not appeal the Federal Court's granting of Tennison's petition for a writ of habeas corpus . . . . [¶] . . . [T]he vacatur of Tennison's conviction by the Federal Court brings him within the ambit of . . . section 851.8(d), as 'a person who has been arrested and [against whom] an accusatory pleading has been filed,' but who has not been convicted; [¶] [and] all evidence in this case . . . shows that Tennison is innocent of all charges relating to the murder of Roderick Shannon and that he should not have been tried for Shannon's murder . . . ."

---

[4] Section 851.8 allows specified classes of individuals to petition the court for a finding of factual innocence and the sealing and subsequent destruction of arrest records. Those classes are (1) persons who have been arrested but no accusatory pleading has yet been filed (§ 851.8, subd. (a)); (2) persons who have been arrested and an accusatory pleading has been filed but no conviction has occurred (§ 851.8, subds. (c), (d)); and (3) persons who are "acquitted of a charge and it appears to the judge presiding at the trial . . . that the defendant was factually innocent" (§ 851.8, subd. (e)). In all cases, "the initial burden of proof shall rest with the petitioner to show that no reasonable cause exists to believe that the arrestee committed the offense for which the arrest was made" (§ 851.8, subd. (b)).

## IV Section 4900 Proceedings[5]

In December 2003, Tennison filed a claim with the Board against the State of California for $445,300 in compensation. In his claim, Tennison stated his innocence was "undisputed" based on the court order declaring him factually innocent under section 851.8. Tennison's codefendant Goff submitted a separate claim for the amount of $489,800. In a lengthy letter brief submitted to the Board on July 16, 2004, the Attorney General disputed Tennison's and Goff's claims of innocence, and submitted that "Goff and Tennison have not proven that they did not commit this murder as is their burden" under the statute. The Attorney General recommended the Board deny the claims. On November 4, 2004, the administrative law judge (ALJ) issued a proposed joint decision concluding Tennison and Goff each "failed to establish by a preponderance of the evidence that he is entitled to compensation pursuant to Penal Code section 4903." The ALJ denied both claims.

Subsequently, the Board adopted the ALJ's proposed decision denying the claims and entered its notice of decision on December 23, 2004. As an initial matter, the Board agreed with the ALJ's determination that the superior court's findings of "factual innocence" pursuant to section 851.8 are "not binding and inapplicable" to a section 4900 proceeding. The Board noted section 851.8, subdivision (i), precludes use of the finding of factual innocence in any further or subsequent "action." The Board stated it was "mindful that the term 'action' has been interpreted to apply exclusively to court actions. However, the nature of this proceeding (a claim for money damages based on the state's wrongdoing) is virtually identical to the type of proceeding the Legislature sought to exclude from its application. . . . The use of a finding of 'factual innocence,' from a proceeding designed to restore the status of a citizen, in a subsequent proceeding for money damages, is not permitted in the civil arena and will not be permitted here. There was also a serious question about the manner in which the finding and order was obtained and whether it was properly accomplished. Also, the term 'factual innocence' does not comprehend the same standard as applicable in this proceeding."

---

[5] Section 4900 provides: "Any person who, having been convicted of any crime against the state amounting to a felony and imprisoned in the state prison for that conviction, is granted a pardon by the Governor for the reason that the crime with which he or she was charged was either not committed at all or, if committed, was not committed by him or her, or who, being innocent of the crime with which he or she was charged for either of the foregoing reasons, shall have served the term or any part thereof for which he or she was imprisoned, may, under the conditions provided under this chapter, present a claim against the state to the California Victim Compensation and Government Claims Board for the pecuniary injury sustained by him or her through the erroneous conviction and imprisonment."

The Board stated Tennison had the burden of "establishing by a preponderance of the evidence that he did not commit the crimes for which he was charged and convicted; and did nothing by way of act or omission, either negligently or intentionally, to contribute to his . . . arrest and convictions." Regarding the state of the evidence, the Board concluded Masina's story "is the most detailed accounting of the event and, frankly, the most credible when compared with the evidence provided by claimants." The Board stated the evidence "obtained pre-conviction was unsworn, inconsistent, vague and incomplete. Almost all the detailed exculpatory evidence in this matter occurred post-trial, and was provided by individuals who were and are well known, some even related, to one another. . . . There was and is a lack of evidence supplied by independent witnesses who have no inherent bias in favor of or against the claimants."

On April 29, 2005, Tennison filed a petition for writ of mandate in the trial court. Respondent filed an answer to the mandamus petition. A hearing was held in July 2005, and the matter submitted. On October 28, 2005, the trial court issued its order and statement of decision denying Tennison's petition for writ of mandamus. The trial court concluded the Board "properly determined that the superior court's prior finding of 'factual innocence' pursuant to Penal Code section 851.8 was not binding on the Board, which conducted a related but different proceeding pursuant to Penal Code sec[tion] 4900 *et seq.* This Court further finds that, on the record before it, respondent Board did not abuse its discretion in concluding that [Tennison] failed to carry his burden . . . of proving that he did not commit a crime." Tennison filed a timely notice of appeal on November 9, 2005.

## DISCUSSION

Three issues are presented in this appeal. First, does the doctrine of collateral estoppel apply to give preclusive effect to the finding of factual innocence under section 851.8 in the section 4900 proceedings before the Board?[6] Second, if collateral estoppel does not apply, what standard of review applies to the Board's decision on the merits of the claim? Third,

---

[6] The Board concluded the superior court's finding of factual innocence was not admissible in the section 4900 proceedings under section 851.8, subdivision (i), which provides: "Any finding that an arrestee is factually innocent . . . shall not be admissible as evidence in any *action*." (Italics added.) Tennison asserts a proceeding conducted by the Board pursuant to section 4900 is a "special proceeding," not an "action," citing *People v. Yartz* (2005) 37 Cal.4th 529 [36 Cal.Rptr.3d 328, 123 P.3d 604] (*Yartz*). According to Tennison, *Yartz* conclusively establishes that section 851.8, subdivision (i) has no effect in "proceedings," and therefore the superior court's finding of factual innocence was admissible in the section 4900 proceedings. We prefer to resolve the issue of preclusion under traditional principles of collateral estoppel, and, consequently, need not decide today whether section 851.8, subdivision (i)'s limitation on admissibility applies to proceedings under section 4900.

under the applicable standard of review, did the Board err in denying Tennison's section 4900 claim for compensation?

## A. *Does the Doctrine of Collateral Estoppel Apply?*

### 1. *Threshold Requirements*

■ Where, as here, "the facts determining whether the trial court properly applied collateral estoppel are uncontested, . . . application of the doctrine is a question of law to which we apply an independent standard of review." (*Roos v. Red* (2005) 130 Cal.App.4th 870, 878 [30 Cal.Rptr.3d 446].) "In general, collateral estoppel precludes a party from relitigating issues litigated and decided in a prior proceeding. [Citations.] 'Traditionally, we have applied the doctrine only if several threshold requirements are fulfilled. First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.' [Citation.]" (*Gikas v. Zolin* (1993) 6 Cal.4th 841, 848–849 [25 Cal.Rptr.2d 500, 863 P.2d 745] (*Gikas*).) Importantly, " '[t]he party asserting collateral estoppel bears the burden of establishing these requirements.' [Citation.]" (*Pacific Lumber Co. v. State Water Resources Control Bd.* (2006) 37 Cal.4th 921, 943 [38 Cal.Rptr.3d 220, 126 P.3d 1040].) Furthermore, "[e]ven if these threshold requirements are satisfied, the doctrine will not be applied if such application would not serve its underlying fundamental principles. [Citation.]" (*Gikas, supra,* 6 Cal.4th at p. 849.)

■ The Attorney General argues the trial court correctly declined to apply collateral estoppel because District Attorney Hallinan and the Attorney General were not in privity and because the issues presented in the two proceedings were not identical. Neither argument is persuasive. District attorneys and the Attorney General both represent the People of the State of California. (Cf. *People v. Garcia* (2006) 39 Cal.4th 1070, 1078–1079 [48 Cal.Rptr.3d 75, 141 P.3d 197] [holding county department of social services is in privity with the district attorney in welfare fraud proceedings because both entities are representatives of the state].) Moreover, the Attorney General has "direct supervision over every district attorney" and has not only the authority but the constitutional duty to intervene and prosecute violations of the law "[w]henever in the opinion of the Attorney General any law of the State is not being adequately enforced . . . ." (Cal. Const., art. V, § 13.) In this

case, there was evidence that the Attorney General was advised of the section 851.8 proceedings and District Attorney Hallinan's intention to stipulate to a finding of factual innocence in those proceedings. Even so, the Attorney General did not intervene. Under these circumstances, it appears the relationship between the San Francisco District Attorney and the Attorney General's Office was sufficiently close to support a finding of privity. (See *People v. Sims* (1982) 32 Cal.3d 468, 487–488 [186 Cal.Rptr. 77, 651 P.2d 321], superseded by statute on another ground as stated in *Gikas v. Zolin, supra,* 6 Cal.4th at pp. 851–852.)

■ The Attorney General's assertion that different issues were decided in the two proceedings is also unavailing. Section 4900 provides relief when an erroneously convicted defendant proves he did not commit the crime charged, and section 851.8 provides relief when an erroneously arrested person proves he was "factually innocent" of the crime in question. Both proceedings concern the identical issue: whether the evidence proves the defendant did not, *in fact*, commit a particular crime. The Attorney General attempts to avoid this point by arguing section 851.8 truly concerns only the legal question of whether, in hindsight, the police had reasonable cause to arrest a suspect. The statute does condition relief on the absence of "reasonable cause," and reasonable cause is a legal determination. (*People v. Adair* (2003) 29 Cal.4th 895, 904–906 [129 Cal.Rptr.2d 799, 62 P.3d 45].) However, this does not end the discussion. "Reasonable cause" represents an objective standard according to which the court evaluates factual evidence. (*People v. Stowell* (2003) 31 Cal.4th 1107, 1116 [6 Cal.Rptr.3d 723, 79 P.3d 1030] [explaining probable cause is "a determination of the facts in light of an objective legal standard" and citing *Adair*].) A legal conclusion that there was "no reasonable cause" to arrest in the context of section 851.8 clearly implies a predicate factual finding that the suspect was innocent (see *People v. Adair, supra,* 29 Cal.4th at p. 905, fn. 4 [noting facts subsequently disclosed may establish a defendant's factual innocence even when there *was* sufficient probable cause to arrest]). Indeed, the statute repeatedly refers to a lack of reasonable cause by the shorthand term "factual innocence." "Reasonable cause" to arrest as used in the statute can only be understood to refer to a determination made after *all* relevant evidence comes to light. Subdivision (g) of section 851.8 provides relief even to one acquitted after trial, about whom there may have been ample "reasonable cause" to support an arrest, and probable cause for trial after a preliminary hearing was conducted. (*Adair, supra,* 29 Cal.4th at p. 905, fn. 4.) Accordingly, we reject the Attorney General's contention that a finding of factual innocence under section 851.8 is somehow different from a finding under section 4900 that the defendant did not commit the crime charged.

■ However, the Attorney General is correct on a related point: it is questionable whether Tennison has met his burden of proving the issue of factual innocence was actually litigated in the section 851.8 proceeding. "An issue is actually litigated '[w]hen [it] is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined.' " (*People v. Sims, supra,* 32 Cal.3d at p. 484, italics omitted.) Tennison's factual innocence was not "determined" by any fact finder in the first proceeding. On the contrary, District Attorney Hallinan expressly conceded the issue, and the court entered an order prepared by Tennison's counsel without having heard any evidence concerning the events in question. The court's order under section 851.8 was thus the equivalent of "a stipulated judgment, or consent decree, [whereby] litigants voluntarily terminate a lawsuit by assenting to specified terms, which the court agrees to enforce as a judgment." (*California State Auto. Assn. Inter-Ins. Bureau v. Superior Court* (1990) 50 Cal.3d 658, 663 [268 Cal.Rptr. 284, 788 P.2d 1156] (*CSAA*).)

■ The collateral estoppel effect of a stipulated judgment is limited under California law. In *CSAA, supra,* 50 Cal.3d at page 664, footnote 2, the court considered whether a stipulated judgment should have any collateral estoppel effect, noting: "In California several cases have held that a stipulated judgment bars subsequent litigation of all issues which were or could have been raised in the original suit. [Citations.] Other states, however, have determined that collateral estoppel effect should not be given, except in the rare case in which it may fairly be said the parties intended such a result. [Citations.]" The *CSAA* court found it unnecessary to resolve the issue because it concluded the parties intended the judgment to collaterally estop further litigation. (*CSAA, supra,* 50 Cal.3d at pp. 664–665, fn. 2.)

Since *CSAA* was decided, courts have taken the position that a stipulated judgment may be given preclusive effect only when the parties manifest an intent for it to do so. Thus, in *Landeros v. Pankey* (1995) 39 Cal.App.4th 1167 [46 Cal.Rptr.2d 165], the court explained: "[A] consent judgment is not usually given preclusive effect in subsequent litigation on a different cause of action, unless the parties manifest an intent in the consent judgment to give it such preclusive effect. (*CSAA, supra,* 50 Cal.3d at pp. 664–665, fn. 2.) That general rule is based on reasoning that 'the parties to a consent judgment generally intend merely to put an end to the litigation at hand.' (Annot. (1979) 91 A.L.R.3d [1170,] 1174.) It is supported also by comment *e* to section 27 of the Restatement Second of Judgments, at page 257: 'In the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated. Therefore, the rule of this Section does not apply with respect to any issue in a subsequent action. The judgment may be conclusive, however, with respect to one or more issues, if the parties have entered an

agreement manifesting such an intention.' 'In such a case the effect results not from the rule of this Section but from an agreement manifesting an intention to be bound.' (Rest.2d Judgments, § 27, reporter's notes, p. 269.)" (*Landeros v. Pankey, supra*, 39 Cal.App.4th at p. 1172.) Accordingly, the court in *Landeros* refused to give the prior stipulated judgment preclusive effect because the judgment did not demonstrate the parties had intended it to have such effect. (*Id.* at p. 1174.) Also, in *Rice v. Crow* (2000) 81 Cal.App.4th 725 [97 Cal.Rptr.2d 110] (*Rice*), the court noted that issues are not actually litigated by way of a consent judgment, and acknowledged the rule articulated in *Landeros*, that " 'a consent judgment is not usually given preclusive effect in subsequent litigation on a different cause of action, unless the parties manifest an intent in the consent judgment to give it preclusive effect.' " (*Id.* at pp. 736–737 & fn. 1.) On that point, the court in *Rice* concluded "[t]he settlement agreement here manifests no such intent but acknowledges that it is a compromise of disputed claims in order to avoid unnecessary expense." (*Id.* at p. 737, fn. 1.)

The record here contains absolutely no indication that the district attorney intended his stipulation under section 851.8 to bind the Attorney General in subsequent administrative proceedings under section 4900. Certainly it would be reasonable to conclude from the district attorney's position in the section 851.8 proceedings, and the Attorney General's stipulation to release Tennison on his own recognizance after the writ of habeas corpus issued, that the state intended to forgo future *criminal* prosecution of Tennison for the murder of Roderick Shannon. But no evidence suggests the state manifested an intent to be bound in restitution proceedings in a separate forum. Therefore, we have serious doubts about whether Tennison satisfied his burden of establishing that his innocence was "actually litigated" for purposes of applying collateral estoppel.

### 2. *Fundamental Principles*

In any event, even assuming threshold requirements were satisfied, application of collateral estoppel is not appropriate where such an application would defeat public policy and the fundamental principles underlying the doctrine. (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 342–343 [272 Cal.Rptr. 767, 795 P.2d 1223] (*Lucido*) [holding that even when all threshold requirements are met, courts must "look[] to the public policies underlying the doctrine before concluding that collateral estoppel should be applied in a particular setting"].) "It must be remembered that '[c]ollateral estoppel is an equitable concept based on fundamental principles of fairness.' [Citation.]" (*White Motor Corp. v. Teresinski* (1989) 214 Cal.App.3d 754, 763 [263 Cal.Rptr. 26].) "[T]he public policies underlying collateral estoppel— preservation of the integrity of the judicial system, promotion of judicial

economy, and protection of litigants from harassment by vexatious litigation—strongly influence whether its application in a particular circumstance would be fair to the parties and constitutes sound judicial policy. [Citation.]" (*Lucido, supra,* 51 Cal.3d at p. 343; see also *People v. Sims, supra,* 32 Cal.3d at pp. 488–489.)

■ As to the first policy, we conclude it would disserve the integrity of the court system to give preclusive effect to what was essentially a stipulated order on the section 851.8 motion. Almost immediately upon Tennison's release from prison, based upon a federal order that was especially critical of the county's prosecutorial practices, District Attorney Hallinan made the decision to mount no opposition to Tennison's petition for a finding of factual innocence. There may have been many practical reasons for doing so. However, even a brief review and basic understanding of the statute would have revealed that Tennison was not entitled to the relief he sought by the motion. Section 851.8 is designed to benefit those defendants who have not committed a crime by allowing them to show that no objective factors justified the official state action subjecting them to criminal charges. (*People v. Matthews* (1992) 7 Cal.App.4th 1052, 1056 [9 Cal.Rptr.2d 348].) The statute simply does not apply to persons who have been convicted of a crime, unless the conviction has been reversed due to insufficiency of the evidence—which is the functional equivalent of an acquittal at trial. (*People v. McCann* (2006) 141 Cal.App.4th 347, 351–354 [45 Cal.Rptr.3d 868].) Tennison was convicted and his conviction upheld on appeal. The federal habeas corpus court granted relief based on a legal impropriety, not insufficiency of the evidence. Unlike an appellate reversal for insufficiency of the evidence supporting a conviction, the federal court's grant of habeas corpus relief did not preclude the People from retrying Tennison. Even had the *Brady* material been provided to the defense, or prosecution evidence limited at a retrial as a sanction for the earlier failure to disclose, we cannot say the evidence would have necessarily resulted in a verdict of not guilty. Even the federal district court judge said only that disclosure of the *Brady* material would have made it reasonably probable that a different result would have obtained in the trial. That is substantially different from a declaration of factual innocence. Thus, despite the district attorney's self-serving stipulation, and the court's acquiescence to it, Tennison was not entitled to petition for or receive a finding of factual innocence under section 851.8. To give collateral estoppel effect to such a finding under these circumstances would not serve, but in our view would undermine, the integrity of the judicial system.

■ Additionally, while it is true that "[p]ublic confidence in the integrity of the judicial system is threatened whenever two tribunals render inconsistent verdicts" (*Lucido, supra,* 51 Cal.3d at p. 347), this problem does not exist because, when the statutes are correctly applied, there is no potential for

overlap between section 851.8 and section 4900 proceedings. Just as "[p]ro-bation revocation hearings and criminal trials serve different public interests, and different concerns may shape the People's pursuit of revocation and conviction," (*Lucido, supra,* 51 Cal.3d at p. 347), so too section 851.8 proceedings and section 4900 proceedings serve different public interests. Section 851.8 establishes procedures for sealing and destroying arrest records of a person found to be " ' "factually innocent." ' " (*People v. Matthews, supra,* 7 Cal.App.4th at p. 1056.) It is designed to benefit those defendants who have not committed a crime by allowing them to show that no objective factors justified the official state action subjecting them to criminal charges. (*Ibid.*) The statute applies only (1) "where a person has been arrested and *no accusatory pleading has been filed*" (§ 851.8, subd. (a)); (2) "where a person has been arrested, and an accusatory pleading has been filed, but where *no conviction has occurred*" (§ 851.8, subd. (c), italics added; see *id.,* subd. (d)); and (3) "[w]henever any person is *acquitted of a charge*" (§ 851.8, subd. (e), italics added.) As discussed, the statute does not apply to a person who has been convicted of the crime charged. Section 4900, on the other hand, accords relief to any person who, *"having been convicted of any crime . . . amounting to a felony* and *imprisoned* in the state prison," can demonstrate "that the crime with which he or she was charged was either not committed at all or, if committed, was not committed by him or her . . . ." (§ 4900, italics added.) By their express terms, sections 851.8 and 4900 are mutually exclusive, except for the rare case where a defendant's conviction has been overturned for insufficient evidence.

For the same reason, applying collateral estoppel in subsequent section 4900 proceedings would not promote judicial economy by minimizing repetitive litigation. The reason is straightforward: because there is no overlap between sections 851.8 and 4900, a petitioner eligible for relief under section 851.8 would not subsequently be a claimant under section 4900, except, as noted, for the rare case illustrated in *McCann, supra,* 141 Cal.App.4th 347.[7]

Finally, applying collateral estoppel in this case would not serve the doctrine's underlying policy of " 'provid[ing] repose by preventing a person from being harassed by vexatious litigation.' " (*Lucido, supra,* 51 Cal.3d at p. 357.) Here, there are no such concerns because Tennison initiated both proceedings and seeks to use collateral estoppel offensively against the

---

[7] The equivalent of a reversal for insufficient evidence might also occur if evidence subsequently presented on a writ of habeas corpus (such as DNA evidence, for example) conclusively established a convicted defendant's innocence. In such a case, the judgment would be set aside, the state would usually be barred from retrying the defendant for the crime, and *McCann* suggests section 851.8 relief is available. As discussed, Tennison's case does not fall within this category.

Board. "[T]he offensive use of collateral estoppel is more closely scrutinized than the defensive use of the doctrine. (See *Parklane Hosiery Co. v. Shore* (1979) 439 U.S. 322, 329–331 [58 L.Ed.2d 552, 99 S.Ct. 645].)" (*White Motor Corp. v. Teresinski, supra,* 214 Cal.App.3d at p. 763.)

■ We conclude the public policies underlying collateral estoppel would not be served by its application under the circumstances presented here. (*Lucido, supra,* 51 Cal.3d at p. 343.) Since Tennison's section 851.8 finding of factual innocence has no collateral estoppel effect on the section 4900 proceedings, we now address the standard of review applicable to the Board's denial of compensation under section 4900.

**B.** *What Is the Applicable Standard of Review?*

**1.** *Legal Standards*

"[A] superior court's review of an agency's adjudicatory administrative decision under Code of Civil Procedure section 1094.5 is subject to two possible standards depending on the nature of the rights involved. [Citation.] If the administrative decision involved or substantially affected a 'fundamental vested right,' the superior court exercises its independent judgment upon the evidence disclosed in a limited trial de novo in which the court must examine the administrative record for errors of law and exercise its independent judgment upon the evidence. [Citations.] The theory behind this kind of review is that abrogation of a fundamental vested right 'is too important to the individual to relegate it to exclusive administrative extinction.' [Citation.]" (*JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1056–1057 [48 Cal.Rptr.3d 563] (*JKH*), fns. omitted.) On the other hand, "[w]here no fundamental vested right is involved, the superior court's review is limited to examining the administrative record to determine whether the adjudicatory decision and its findings are supported by substantial evidence in light of the whole record. [Citation.] Substantial evidence, of course, must be ' "of ponderable legal significance," ' which is reasonable in nature, credible and of solid value. [Citations.]" (*Id.* at p. 1057.)

"Regardless of the nature of the right involved or the standard of judicial review applied in the trial court, an appellate court reviewing the superior court's administrative mandamus decision always applies a substantial evidence standard. [Citations.] But depending on whether the trial court exercised independent judgment or applied the substantial evidence test, the appellate court will review the record to determine whether either the trial court's judgment or the agency's findings, respectively, are supported by substantial evidence. [Citation.] If a fundamental vested right was involved and the trial court therefore exercised independent judgment, it is the trial

court's judgment that is the subject of appellate court review. [Citations.] On the other hand, if the superior court properly applied substantial evidence review because no fundamental vested right was involved, then the appellate court's function is identical to that of the trial court. It reviews the administrative record to determine whether the agency's findings were supported by substantial evidence, resolving all conflicts in the evidence and drawing all inferences in support of them. [Citations.]" (*JKH, supra*, 142 Cal.App.4th at p. 1058, fn. omitted.)

"If the administrative findings are supported by substantial evidence, the next question is one of law—whether those findings support the agency's legal conclusions or its ultimate determination. [Citation.] If the administrative record reveals the theory upon which the agency has arrived at its ultimate decision, the decision should be upheld so long as the agency found those facts that as a matter of law are essential to sustain the decision. [Citation.]" (*JKH, supra*, 142 Cal.App.4th at pp. 1058–1059.)

2. *Analysis*

In this case, the trial court determined no fundamental right was involved and reviewed the Board's decision for substantial evidence. However, Tennison contends the Board's decision affects his fundamental right because he seeks the "restoration of the living itself he lost as a result of his wrongful imprisonment." Tennison's attempt to characterize the right at stake here as fundamental is unpersuasive.

"The determination whether a right is fundamental and vested for purposes of ascertaining the appropriate standard of judicial review in an adjudicative administrative mandamus action is made on a case-by-case basis. [Citation.] . . . [¶] Courts have interpreted fundamental vested rights to include individual rights guaranteed under the due process and equal protection clauses of the state and federal Constitutions. [Citation.] A fundamental right may also be vested by statute. (*Kerrigan v. Fair Employment Practice Com.* (1979) 91 Cal.App.3d 43, 51 [154 Cal.Rptr. 29] [statutory right to be free from age discrimination in seeking employment is vested].) Fundamental vested rights also include matters which ' "although not involving vested property rights in the traditional sense, nevertheless had [a significant] impact on the individual . . . ." [Citations.]' [Citation.] . . . In addition, the concepts of 'fundamental' and 'vestedness' are interrelated such that courts will examine the extent to which a right is vested, i.e., legitimately acquired or already possessed by the individual, in determining whether it is fundamental. [Citation.] 'A "fundamental vested right" has been defined in terms of a contrast between a right possessed and one that is merely sought. [Citation.] " 'The term "vested" denotes a right that is either "already possessed"

[citation] or "legitimately acquired" [citation].' " ' [Citation.]" (*JKH, supra*, 142 Cal.App.4th at pp. 1059–1060.)

■ Under these standards, Tennison's application for monetary compensation pursuant to section 4900 is neither fundamental nor vested. Although it could be said the right to *claim* compensation under section 4900 is vested, the right to *obtain* compensation does not vest until a claimant persuades the Board on the merits of the application, and the Board reports "the facts of the case and its conclusions to the next Legislature . . . with a recommendation that an appropriation be made . . . for the purpose of indemnifying the claimant for the pecuniary injury." (§ 4904.) Accordingly, we conclude the presentation of a "claim against the state to the . . . Board for the pecuniary injury sustained . . . through . . . erroneous conviction and imprisonment" does not implicate a fundamental vested right. (§ 4900.)

In sum, the administrative decision here did not involve or substantially affect a fundamental vested right. Thus, the trial court correctly limited its review "to examining the administrative record to determine whether the adjudicatory decision and its findings are supported by substantial evidence in light of the whole record." (*JKH, supra*, 142 Cal.App.4th at p. 1057.) Therefore, "[our] function is identical to that of the trial court. [We] review[] the administrative record to determine whether the agency's findings were supported by substantial evidence, resolving all conflicts in the evidence and drawing all inferences in support of them. [Citations.]" (*JKH, supra*, 142 Cal.App.4th at p. 1058, fn. omitted.)

C. *Is the Board's Decision Supported by Substantial Evidence?*

■ A claim for "pecuniary injury sustained . . . through . . . erroneous conviction and imprisonment" may be presented pursuant to section 4900 if the claimant can show he or she is "innocent of the crime with which he or she was charged" because it was "not committed by him or her." (§ 4900.) Specifically, "[i]n order to receive favorable board action on a claim of erroneous imprisonment, claimant must prove three factual propositions. 'The claimant must prove the facts set forth in the statement constituting the claim, including [1] the fact that the crime with which he was charged was either not committed at all, or, if committed, was not committed by him, [2] the fact that he did not, by any act or omission on his part, either intentionally or negligently, contribute to the bringing about of his arrest or conviction for the crime with which he was charged, and [3] the pecuniary injury sustained by him through his erroneous conviction and imprisonment.' " (*Diola v. State Board of Control* (1982) 135 Cal.App.3d 580, 587 fn. 5 [185 Cal.Rptr. 511], quoting § 4903.)

1. *Evidence of Innocence*

Among the evidence offered in support of Tennison's claim of innocence was the testimony of Chante Smith. At the section 4900 hearing, Smith testified she was present on the evening Shannon was murdered. Smith stated she was with Luther Blue, "LaVinsta" (Ricard) and Mark Anthony. The four were driving around in Smith's blue Mustang convertible. Smith drove, Blue was in the front passenger seat and the other two were in back. They stopped at Third Street Liquors. A burgundy-colored truck and two carloads of people pulled up behind them. Among the people in the vehicles was a rap group from the Lakeview area known to Smith and her companions as the Ill-Mannered Posse (IMP). Ricard and Anthony spoke to the members of the IMP, and made plans to go drinking together after meeting together at the 7-Eleven on Bayshore Boulevard.

Smith arrived at the 7-Eleven before it closed at 2:00 a.m. Luther Blue and Mark Anthony were in her car but Ricard traveled to the 7-Eleven in the bed of the truck with four to six of the IMP. Everyone except Smith and Luther Blue went into the 7-Eleven. While they were in the store, a close friend of Smith's named Troy Barnes pulled up in a dark-colored Skylark. Smith told Barnes to leave immediately because he was from Sunnydale and there was a feud going on between Hunters Point and Sunnydale. Troy Barnes left, heading south towards Bayshore. About a minute later, Smith saw a dark-colored Skylark coming around the corner from the other direction. Smith assumed Barnes had circled around the block. Meanwhile, the others came out of the 7-Eleven, saw the Skylark, and gave chase because they thought the driver was from Sunnydale. The truck gave chase first, followed by two cars. Smith followed the two cars because she was concerned for her friend Barnes.

Smith testified: "I saw a truck and two cars chasing one car with a young man in it, going forward. But I turned off the street. I didn't want to be right there. There were gunshots—there was a couple of gunshots fired . . . . [W]hen I came back around, there was a car going backwards, . . . with smoke coming from the wheels." This happened on Leland Street. Smith turned off and went around the block again. When she came back onto Leland Street, she could no longer see the car being chased but saw a young man running down Leland towards Bayshore. Smith saw it was not her friend Barnes but Luther Blue recognized him as Roderick Shannon (Cooley). Smith turned off Leland again and ended up at the Super Fair parking lot.

When Smith arrived, Cooley (Shannon) was already being beaten up by a group of about 10 or 12 youths. Smith could not see the victim because the group was in a huddle around him. Mark Anthony jumped out of Smith's car

but stood behind the crowd and did not participate in the beating. Not everyone was participating in the beating but Smith couldn't say how many people were and how many were not. Luther Blue stayed in the car with Smith. Next, Smith saw "LaVinsta" (Ricard) leave the crowd and get a shotgun from the truck. When he returned, the crowd parted, and "LaVinsta" (Ricard) shot Cooley (Shannon). Smith said she did not actually see Ricard shoot the victim: "I saw him with the gun and, seconds later, the gun went off." She heard one shot and afterwards, "Pretty much everybody ran." Smith stated she did not see Tennison at the 7-Eleven or at the scene of the murder in the Super Fair parking lot.

As further evidence of his innocence, Tennison states Ricard confessed to the murder after Tennison was found guilty but while his new-trial motion was pending. On November 7, 1990, Ricard was interviewed by Officers Lewis and Gittens of the gang task force unit. The officers asked what Ricard knew about the events of the evening leading to Shannon's homicide. Ricard said he was getting drunk with some people in Sundial Park in Hunters Point. He said he had a shotgun with him and was running off at the mouth about what he would do about his friend "Cheap Charlie" who had been shot on Third Street. As to the shotgun, Ricard said he "bought it off someone" and had only owned it a few days. Ricard said people in two or three vehicles decided to ride through Sunnydale. He rode in the bed of a truck. He saw a black car going towards Sunnydale, stared at the driver, said, "That's one of those Sunnydale niggers right there" and began shooting at the car. The driver threw his car in reverse and went backwards. The driver of the truck did the same and chased the car. The car ran up the curb into a fence, and the driver jumped out and began running. Some people chased the driver on foot, cornered him and began beating him up. Ricard rode in the truck over to where the driver had been cornered, and then, "I got out the truck, jumped out the back of the truck with the gun and when I pointed it at him, everybody cleared back and I shot him." Ricard did not recognize the person he shot. Others there were shouting, "Do it."

After that, everybody drove off in different directions. Officer Lewis commented: "Well, it sounds like you're gonna avoid at all possibility telling me who the individuals are with you [*sic*]. Do you know about how many in total were there [with] you?" Ricard said about 10 people were on the victim when Ricard got out the truck. As for what happened to the shotgun, Ricard said, "[T]he person that was keeping it for me, they said it got stolen." As to surplus shells for the shotgun, Ricard said, "Ah, I may have got rid of those. Didn't have no need for them." Ricard said three or four people were in the back of the truck with him. When asked whether they were partners or friends or associates, Ricard said, "I don't want to say." As to ammunition for

the shotgun, Ricard said he bought some shells, not a whole box, at Big 5 Sporting Goods. He did not use his own name to pay for the shells, nor did he use a false name. Instead, Ricard "got someone to go in" for him, "Someone off the street. I paid him couple of dollars to go buy me some shells."

Lewis reminded Ricard that Tennison and Goff had been convicted of the murder. Lewis asked whether either Tennison or Goff was present that evening. Ricard said, "No they were not. Those two individuals I do know. I know 'em really well." The following exchange then took place:

"Lewis: How do we know that you aren't just doing this to kind of get them off because they have been convicted?

"Ricard: There's no way I can really make you believe that what I'm saying you know is true but like I said, . . . its' been bothering me. I'm trying to do the right thing. Two of my friends are going down for something I did and I just want to get it cleared up. I want it cleared. [¶] . . . [¶]

"Lewis: Okay, well . . . [w]e're here tonight to get to the truth. You have to understand that in getting to the truth, we have to . . . get to the things that only you would know because you were there. And we have to get to the fact that unfortunately you gonna have to, at some point or another, like I need to know some other people that were there. There's no way that I can verify what you're saying unless I know that."

Thereafter, Ricard provided no useful corroborating information. He said there were three vehicles involved, a pickup truck and two cars, one of which was a convertible, but would not say what color. Ricard said two other people besides himself were in the convertible but he wouldn't say who they were because "it will be bringing them into something that really they wouldn't have too much to do with 'cause like I say that was the car that pulled up after it was over." Ricard refused to say who was in the convertible despite Officer Lewis's entreaty that "We're not after them. I mean I'm gonna talk to 'em . . . but I'm not, there's no charges that I can see being leveled against them unless they actually took part in this thing." Ricard said they met the other car and truck at Third Street Liquors and decided to go up to the sundial. Before they went to the liquor store, Ricard picked up the shotgun, which he kept hidden "somewhere outside." Lewis asked, "Who else would know that you had that gun that night" but Ricard replied, "I said I just don't want to bring other people into it." The interview concluded without Ricard providing any corroborating information.

The other two individuals identified by Smith as occupants of the car driven by her, Luther Blue and Mark Anthony, both executed declarations under penalty of perjury after Tennison's conviction. In his declaration dated November 6, 2000, Blue stated he was a witness to the shooting of Roderick Shannon, he knew "Sodapop" (Goff) and "JJ" (Tennison), and they were not among the people at the scene of the shooting. In his declaration dated June 25, 2001, Anthony stated he was a passenger in Smith's car, witnessed the pursuit of the Skylark driven by the victim, and then "saw people getting out of the vehicles to chase the guy in the Skylark but didn't want to have anything to do with what was going on. Before long, I heard a big boom. As I got back in [Smith's] car, I heard her say that Lavinster (Ricard) was not getting back in her car." Anthony stated there were no Samoan girls standing around when this was going on. Also, he declared Goff and Tennison "were not even present that night." He further averred the reason he did not come forward was because he was afraid he could be arrested just for being there and also because "there can be serious consequences for people who tell on other people."

Also, at the section 4900 hearing, Tennison offered alibi evidence in support of his claim to be innocent of the crime. Tennison testified he had nothing to do with the murder and was not present when Shannon was killed. Tennison stated he was at a party on Harbor Road on the evening of August 19, 1989. It was at a friend's house and about 20 to 25 people were present. Tennison left the party late in the evening and returned to Rhonda Flanagan's house less than a block away. Rhonda was the mother of Tennison's best friend, Chris Matthews, and Tennison was staying with Rhonda and her two younger sons that summer while Chris was in juvenile detention. When Tennison got back, Rhonda was at home with her boyfriend and another friend named Joyce Hammond. Tennison hung out with them a short while, then went to bed. Sometime later, Rhonda woke him up and asked him to watch the guys who were working on Chris's van to be sure they were doing the job correctly. Tennison watched them for 15 minutes then went back to bed. Rhonda woke him up again, this time to ask him to go to the bowling alley to pick up her two sons and bring them home. Eventually he got up to go and get the boys. Joyce Hammond was still there at this point. The boys were at the Sierra Bowl on Broadmore. Tennison said he drove directly to the bowling alley, picked up the boys and three of their friends, and drove directly home. The whole trip took about 35 minutes at most. When he got back, Joyce and Rhonda were still in the living room. Tennison went directly back to bed.

Rhonda Flanagan testified at the section 4900 hearing. She testified she talked to an investigator after Tennison was arrested about "a particular night when 'JJ' (Tennison) was supposed to have been at my house," which she assumed was the night of the murder. Rhonda did not recall if the investigator

worked for the prosecution or defense. Rhonda said Tennison arrived at her house that evening as it began to get dark. Tennison was staying with Rhonda at that time at her oldest son Chris's request. Also present were Louis Covington, Rhonda's boyfriend, and her "god-sister" Joyce Hammond. Tennison sat with them for a bit then said he was tired and went to bed. Then Rhonda's son Chris called and said he wanted Tennison to get someone to take the speakers and stereo system out of his van. Rhonda woke Tennison and he got up. Rhonda said she didn't know if Tennison got someone or not, but he went back to bed and Rhonda's boyfriend started taking the stereo out of the van. Rhonda woke Tennison again to go fetch her boys and three friends from the Sierra Bowl. She did not think Tennison had left the house in the meantime. Tennison left to get the boys in Chris's burgundy Skylark. Rhonda was still awake when he got back. She did not recall how long he had been gone, but a round trip would typically take about 45 minutes to an hour. Tennison did not seem agitated or upset on his return, but was tired and went back to bed. Rhonda stated she would have testified at trial if she had been asked and it surprised her she was not asked to testify.

In support of his claim he is innocent of the crime, Tennison also attacks the credibility of the prosecution's two young witnesses—Masina Fauolo and Pauline Maluina. As to Masina, Tennison alleges: Masina had a motive to lie because she was "best friends" with the victim and was also from Sunnydale; Masina was coached and probably paid by the police because Inspector Hendrix spoke to her almost daily at one point in the investigation, and Hendrix could not account for $2,500 he requested from the Secret Witness Program in October 1989; Masina's story was inconsistent and at odds with other evidence in the case because the stolen car she claimed to have abandoned at the scene was not found, she made no mention of cars driving backwards as noted by neighborhood witnesses, and she said Shannon was being beaten with baseball bats but there was no medical evidence of such beating; and Masina's version of events was "unbelievable on its face." As to Pauline, Tennison avers her version of events is inconsistent with Masina's version because she did not even mention a car chase; Pauline recanted her initial statement she witnessed the murder, took an inconclusive polygraph test, and was then persuaded to return to her original statement by the police and Masina; Pauline submitted a declaration under penalty of perjury in June 2003 stating she did not witness the murder.

### 2. *Analysis*

At the outset, it bears emphasizing that our job is not to judge whether, in the light of the evidence described above, the People today could prove beyond a reasonable doubt that Tennison committed the murder. Rather, our task is to evaluate whether substantial evidence supports the Board's determination Tennison failed to carry *his* burden of showing (1) he is innocent

because he did not in fact commit the crime; and, (2) he did not in any way contribute to his arrest or conviction. (§§ 4900–4903.)

The Board rejected Tennison's evidence of innocence because "the evidence obtained pre-conviction was unsworn, inconsistent, vague and incomplete. Almost all the detailed exculpatory evidence . . . occurred post-trial, and was provided by individuals who were and are well known, some even related, to one another. Given the nature and circumstances surrounding this case, testimony from such individuals was viewed with skepticism, where it was not corroborated by independent and unbiased sources. Consequently, little if any weight was given to unsupported declarations that simply tended to corroborate one another or statements or testimony adduced during the instant hearing. There was and is a lack of evidence supplied by independent witnesses who have no inherent bias in favor of or against the claimants." The Board's position is amply supported by substantial evidence.[8]

When Chante Smith was interviewed by Inspector Hendrix on January 3, 1990, before Tennison's trial, she told him she had heard certain individuals, including Ricard, were involved in Shannon's murder. At that time she did not aver she was a percipient witness to the murder. It was not until July 24, 1992, after Tennison and Goff were tried and convicted, that Smith, in an interview in connection with possible new evidence in the case, told police she was at the scene when the murder occurred. However, Smith's January 1990 statement to police that she had heard Ricard was involved prompted police to interview Ricard on February 8, 1990. Inspector Hendrix of the homicide detail and Officer Michael Lewis of the gang task force told Ricard his name had come up in connection with Shannon's murder. But in that interview, Ricard denied he was present the night Shannon was killed. And he denied shooting Shannon to avenge the death of his friend, "Cheap Charlie." Like Smith's admission she was a witness, Ricard's confession did not come until November 1990, after Tennison had been tried and convicted. And in his confession, Ricard refused to provide any meaningful corroborating evidence to back his story—the shotgun had been stolen, an unknown person off the street bought the shells for the gun, and he refused to identify anyone who had seen him at the scene, even persons who in his estimation had not

---

[8] At oral argument, appellant pressed claims that the Board imposed an improper burden of proof (clear evidence) and improperly relied on the jury verdict. We refuse to consider appellant's burden of proof argument because it was raised for the first time in his reply brief. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764 [60 Cal.Rptr.2d 770] [" 'Points raised for the first time in a reply brief will ordinarily not be considered, because such consideration would deprive the respondent of an opportunity to counter the argument.' [Citation.]"].) Moreover, it is a meritless contention founded on a single remark in the Board's opinion, which plainly utilized the correct burden of proof in announcing its legal conclusions. Further, the Board's findings were based on its independent analysis of the evidence and were not reliant on the jury verdict.

participated in the beating or murder.[9] Indeed, most recently Ricard recanted his confession. After Tennison was released from prison on habeas corpus, police interviewed Ricard in September 2003 at his home out of state. Ricard said he'd lied about his involvement in an attempt to help his friends, and said he was telling the truth in his first interview with the police, when he denied being present on the night of the murder. So too, Luther Blue and Mark Anthony made exculpatory statements only after Tennison's trial and conviction. The Board was justified in treating this post hoc evidence by Tennison's friends and acquaintances with skepticism and according it little weight.

Similarly, the alibi testimony of Rhonda Flanagan cannot be said to be entirely disinterested. Rhonda knew Tennison as "JJ" when he was growing up in Hunters Point, Tennison was her son Chris's best friend, and Tennison was living with her in August 1989. Nevertheless, even if Rhonda's testimony is taken at full face value, it does not exonerate Tennison or show he did not, or could not have, committed the crime. Rhonda testified at the section 4900 hearing that she could not recall how long Tennison was gone after he left to pick up her sons from the bowling alley, and she did not put a specific time either to his departure or return. Indeed, in the interview with police on December 1, 1989, at which time Tennison was charged with Shannon's murder, Tennison told Inspector Hendrix he was at Rhonda Flanagan's on the night of the murder. Tennison told Hendrix he should talk to Rhonda and her sons, as well as Rhonda's friends, who could all verify he was there that night. Hendrix replied: "I have talked to a lot of them. They backed your story pretty well except certain times, which are the crucial times, unaccounted for at this point, and I have to believe the two witnesses because they have no ax to grind with you."[10]

In point of fact, the existence of this alibi evidence cuts against Tennison's section 4900 claim. Tennison claimed he was at Rhonda Flanagan's when police accused him of the Shannon murder, yet he never presented such potentially exculpatory alibi evidence to the jury. Tennison did not testify at his trial. But he could have presented his alibi defense through the testimony of Rhonda as well as the other individuals who were at Rhonda's apartment

---

[9] The Board also discounted Ricard's confession because "the most glaring discrepancy is his claim he shot the victim once, when the forensic evidence conclusively established injuries from two distinct shots from a shotgun." Chante Smith also testified she heard only one shot before "everybody ran." The Board had before it a complete transcript of Tennison's trial, but appellant has not included a transcript of any of the forensic testimony in his appendix. On that basis, respondent argues Tennison has forfeited review of sufficiency of the evidence by failing to provide the necessary record for review. Because we are satisfied substantial evidence in the appendix supports the Board's decision, we need not address this issue.

[10] At trial, Officer Fukunaga, who responded to the scene, testified her best estimate of when the shooting occurred was 2:05 a.m.

that evening. Indeed, Rhonda testified at the section 4900 hearing she was surprised she was not summoned to testify at trial. Jeff Adachi, Tennison's public defender, testified at the section 4900 hearing he made a tactical decision not to put on an alibi defense, based on his concern it might redound to Tennison's cost because "it would have put him out on the street in the same vicinity—not vicinity I'd say, but within two miles of where this occurred." We do not question counsel's tactical choice at the criminal trial in this matter of alibi evidence. Nevertheless, for purposes of Tennison's section 4900 claim, the failure to present this readily available alibi evidence is substantial evidence supporting the Board's finding Tennison failed to show "he did nothing by way of act of omission, either negligently or intentionally, to contribute to his arrest or conviction."

Also, in regard to Tennison's failure of proof on this aspect of his section 4900 claim, the Board found Tennison's assertion he did not know anything about Chante Smith or her involvement until after he was convicted was "simply not credible." The Board stated: "It defies logic and reason that two individuals would spend the better part of a year in jail awaiting trial and never have received any indication from friends or relatives of what the 'word on the street' was about the shooting." On that basis, the Board concluded Tennison failed to show "he did nothing by way of act of omission, either negligently or intentionally, to contribute to his arrest or conviction" because, "by their silence, they [Tennison and Goff] deprived their attorneys of significant information."

The Board's finding on this point is supported by substantial evidence. Tennison testified at the section 4900 hearing he had no contact whatsoever with Chante Smith before the trial, either directly or through intermediaries. Yet at the July 1992 hearing, Smith testified that about a week after the murder she was approached by "Sodapop" (Goff). Goff told her Ricard confessed to him, and said Smith had been at the scene. At that point, Smith told Goff, "I don't know what you're talking about." Smith testified Ricard told a lot of people around Oakdale he was the shooter and "it was not a secret." However, Smith stated she did not come forward at that time because "Luther Blue had told someone that he would pay them $10,000 to kill me." Smith opined Blue did that because "him [*sic*] and LaVinsta (Ricard) are real close" and Blue thought Smith was going to identify Ricard as the shooter. In addition, Smith testified she came to know JJ (Tennison) after her friend Rhonda Law introduced them in May 1989. Smith testified that while Tennison was in county jail "he was sending messages by a lot of people . . . to come down and talk to the attorney or come down to the court date . . . ." Smith said Tennison and Goff did not explicitly ask her to step forward and testify for them, but "they sent messages and I know it came straight from them." Smith stated this happened before trial and agreed that she "would have had to come" to the trial if she had been served with a subpoena. Thus,

substantial evidence supports the Board's finding "claimants, for their own unstated reasons, elected not to disclose Smith's identity to their respective attorneys."

Finally, returning to the issue of factual innocence, the Board found that Masina provided "the most detailed accounting of the event, and, frankly, the most credible when compared with the evidence provided by claimants." Again, this finding is supported by substantial evidence.[11] At a pretrial interview in 1989, Masina Fauolo stated she saw three cars and a truck occupied by young Black men chase a Skylark driven by Cooley (Shannon). The pursuit began at a location known to Masina as "Lover's Lane" at the intersection of Visitation and Mansell. Masina saw Shannon pursued on foot after his vehicle crashed and his subsequent beating at the hands of the mob. Masina picked out two of the participants from a photo lineup, identifying "Fat JJ" (Tennison) as one of those who beat the victim, and "Pop" (Goff) as the shooter. Tennison has produced no reliable, independent evidence to convincingly refute Masina's account of events on the night of the murder. Even if the recantation of Pauline Maluina is taken at full face value, it does not directly undercut Masina's claim she witnessed the murder. Pauline claims Masina asked her "to lie about having witnessed the murder of Roderick Shannon." Yet nothing in Pauline's recantation indicates Pauline has knowledge Masina was lying about being a witness to the murder (as would have been the case if, for example, Pauline claimed and could prove she and Masina were *both* somewhere else at the time of the murder). Pauline's recantation went solely to the basis of her own trial testimony.

We conclude substantial evidence supports the Board's decision Tennison failed to meet the heavy burden of proof required for relief under section 4900. As the Board noted, "the question to be answered is not whether there is sufficient evidence to establish culpability, but whether or not claimants can establish they are not culpable." Tennison had to prove he is "innocent of the crime with which he . . . was charged." (§ 4900.) To do so, he was required to demonstrate he did not commit the crime, and also that he did nothing "either intentionally or negligently [to] contribute to the bringing about of his arrest or conviction." (§ 4903.) As discussed above, substantial evidence supports the Board's determination Tennison failed to carry his burden of proof. Accordingly, the Board did not abuse its discretion in denying his request for relief under section 4900.

---

[11] The Board had before it a complete transcript of Tennison's trial. However, appellant has not included a complete transcript of Masina's trial testimony in his appendix. (See fn. 9, *ante.*)

## DISPOSITION

The judgment is affirmed.

McGuiness, P. J., and Siggins, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 17, 2007, S155150. George, C. J., and Werdegar, J., did not participate therein. Kennard, J., was of the opinion that the petition should be granted.