**In re Michael YAIKIAN, Debtor.**

**Karapet Yaikian, Plaintiff,**

v.

**Michael Yaikian, Defendant.**

**Bankruptcy No. 12–12625–MM7.
Adversary No. 12–90431–MM.**

United States Bankruptcy Court,
S.D. California.

Signed March 31, 2014.

Bradley L. Jacobs, Atty. at Law, San Diego, CA, for Plaintiff.

Julian McMillan, McMillan Law Group, San Diego, CA, for Defendant.

## MEMORANDUM DECISION

MARGARET M. MANN, Bankruptcy Judge.

This case involves a father, Karapet Yaikian ("Karapet"),[1] who sued his son, Michael Yaikian ("Michael"), for fraud; first in state court resulting in a stipulated judgment, and then in this Court when Michael filed bankruptcy. Karapet's conduct observed and recounted at trial did not reflect high personal standards, and included arson, bribery of prison officials, evading collection of a restitution judgment, intentionally misleading immigration authorities, and submitting a false declaration in this case. Karapet also contradicted himself on the witness stand, suffered from significant memory lapses, was evasive as a witness, and even appeared to sleep during some of the proceedings. The clearly biased testimony of Karapet's state court counsel did not assuage these credibility problems. Certain of Michael's actions, such as maintaining inadequate records and not reading the documents he signed, may not have been according to Hoyle, but on balance, Michael's testimony was largely credible.

While the Court thus can easily conclude Karapet failed to carry his burden of prov-

---

**1.** The Court will refer to the parties, who are all family members and share a surname, by their given names to avoid confusion. It intends no disrespect by this reference.

ing his nondischargeability claims, *Grogan v. Garner*, 498 U.S. 279, 283, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (burden of proof on the plaintiff), it must still address issue preclusion. Karapet and Michael had stipulated to judgment in state court on both breach of contract and fraud grounds, and also that the stipulated judgment would be nondischargeable in bankruptcy. Karapet based his claims on Michael's admission of fraud in state court, and later asserted that the fraud stipulation should be afforded preclusive effect. Given Karapet's credibility challenges, issue preclusion is the only ground on which he could prevail, and may be outcome determinative. *See also Gayden v. Nourbakhsh (In re Nourbakhsh)*, 67 F.3d 798, 801 (9th Cir.1995) (per curiam) ("The full faith and credit requirement of [28 U.S.C.] § 1738 compels a bankruptcy court in a § 523(a)(2)(A) nondischargeability proceeding to give collateral estoppel effect to a prior state court judgment.").

Karapet also has the burden of proof on the preclusion issue, but fails to sustain it. Generally, stipulated judgments in California are afforded claim preclusive effect, but not issue preclusive effect. The reason is that these judgments are the product, not of litigation but of negotiation. The role of the state court in entering the judgment on a stipulation is more circumscribed so that unless the state court record reflects that it considered evidence of the wrongdoing at issue, the substantive issues are neither actually nor necessary decided by the state court. While stipulated judgments can preclude relitigation of specified issues if the parties make that intent sufficiently clear, the evident goal of Karapet's stipulated judgment was only to except Michael's debt from discharge in bankruptcy. This intention cannot be enforced by this Court as a matter of public policy. Because issue preclusion does not apply here, this case will be decided on the evidence at trial that Michael did not defraud his father.

## I. *JURISDICTION*

This Court has jurisdiction under 28 U.S.C. §§ 157 and 1334(b), and constitutional authority to enter a final judgment in this action. *Deitz v. Ford (In re Deitz)*, 469 B.R. 11, 24 (9th Cir. BAP 2012) (citing *Sasson v. Sokoloff (In re Sasson)*, 424 F.3d 864, 867 (9th Cir.2005)). This dischargeability matter was identified as statutorily core, and the parties also implicitly consented to the Court's final adjudication of it. *Exec. Benefits Ins. Agency v. Arkison (In re Bellingham Ins. Agency)*, 702 F.3d 553 (9th Cir.2012), *cert. granted by* —— U.S. ——, 133 S.Ct. 2880, 186 L.Ed.2d 908 (2013).

## II. *FINDINGS OF FACT*

In the fall of 2002, Michael's parents, Maria and Karapet began divorce proceedings in which restraining orders were issued against Karapet. The restraining orders and Karapet's severe alcoholism made it difficult for him to retain any role in the family business, San Diego Country Caters, Inc. ("SDCC") in which Michael had also worked since the age of 15 and was owned by Michael and his parents. SDCC serviced catering trucks and also owned a gas station in Chula Vista, California. To facilitate the divorce and extricate Karapet from the business, Michael as the president of SDCC and his parents began negotiating a Stock Repurchase Agreement ("SRA"). Karapet was assisted by separate counsel. Under the SRA, Karapet was promised lifetime financial support from SDCC in exchange for his sale of his interests in SDCC back to the corporation.

The final version of the SRA was not signed until March 13, 2003, about a half year after the negotiations began, because

Karapet repeatedly evaded signing it. Despite this later execution date, the SRA was expressly made effective as of December 31, 2002. The support SDCC agreed to provide to Karapet constituted weekly payments of $750 plus health insurance for life, and advance notice to Karapet if the assets of SDCC were later sold. Although they were individual parties to the SRA, Michael and Maria had no direct payment obligations under the SRA. They did, however, personally guarantee SDCC's obligations under the SRA. After the SRA was signed, SDCC made 12 of the required payments to Karapet and also provided health insurance.

Despite the adversarial nature of his parent's divorce, Michael remained on friendly terms with Karapet. When Karapet was required to move out of the family home in the fall of 2002, he moved in with Michael before moving to Los Angeles to live with Karapet's sister.

In January 2003, after the effective date of the SRA but before it was signed, Karapet for "secret" reasons set fire to Maria's house with gasoline. Karapet explained that he was angry about losing the house in the divorce. Twelve people, including Michael, Maria and other family members, were present inside when the fire was set. Everyone inside managed to escape and no one was harmed, but Karapet was arrested and charged with arson.

Karapet underwent detoxification for his alcoholism in a substance abuse treatment program called the Etheridge Center in April 2003. While there, Karapet severely burned his foot, and he was hospitalized in June for that problem and also for pneumonia and delirium tremors from detox. He suffered a heart attack while hospitalized and remained there for a month. Karapet later sued the Etheridge Center, and the case was settled for an undisclosed amount. Michael remained supportive of

his father and paid the legal fees and assisted the prosecution of that civil suit.

After pleading guilty in August 2003 to the arson charges, Karapet was sentenced to three years in prison. A $350,000 restitution judgment was entered against him as part of the criminal proceedings. Michael assisted his father's criminal defense by testifying at his sentencing hearing. Karapet served three years in prison and then about a year in detention by immigration authorities while awaiting deportation to Armenia. Karapet proudly testified that he manipulated the immigration authorities to falsely believe he was too sick to travel due to risk of death, and thereby secured his release from detention in 2007 instead of being deported to Armenia.

Michael remained an attentive son while Karapet remained in custody, visiting Karapet and providing him with care packages, cash, and a Rolex watch. Michael also complied with Karapet's request to pay cash to "Chris," who was somehow involved in the prison system, so that Karapet would secure a more favorable prison assignment. Karapet requested these favors in lieu of the weekly payments required under the SRA because Karapet was concerned that regular payments might be seized to satisfy the restitution judgment. Karapet also did not want Michael to deposit the payments into the joint bank account Karapet shared with his sister out of fear that his sister's son, a methamphetamine addict, would somehow get the money. Neither party kept records of the cash payments, nor was any exact accounting provided. This testimony, largely by Michael, was either corroborated by Karapet or undisputed, so the Court accepts it as true. The record was also clear that the parties were accustomed to dealing in cash in their business.

When he was released from custody, Karapet filed a complaint in state court on

February 6, 2008, against Michael, Maria and SDCC for recovery of the amounts due under the SRA. Karapet alleged breach of contract and numerous other theories including fraud. The state court suit settled in August 2008 with a $210,000 initial payment that brought Karapet current under the SRA, and SDCC then resumed the $3,000 monthly payments to Karapet. Michael settled since he had always intended to pay his father under the SRA contract and also sought to save the family business from further disruption from the attachment motions Karapet filed in the state court suit. After the initial payment was made by SDCC under the settlement agreement in September 2008, Karapet dismissed the suit with no judgment being entered. The parties agreed as part of the settlement that upon default a stipulation for entry of judgment signed could be filed to enter a nondischargeable judgment against Michael, Maria and SDCC. The stipulation "stipulated" and "admitted" to both breach of contract and fraud in the inducement regarding the SRA.

After SDCC made an additional $72,000 in payments to Karapet under the settlement, SDCC and Michael encountered financial problems and defaulted in the fall of 2010. Before then, Michael had sold the SDCC gas station in San Diego without complying with the due on sale clause in the SRA and bought a gas station in Los Angeles with the proceeds. Michael moved the family business to Los Angeles where he was living so that he could better protect his mother and sister from his father. The new gas station then failed after problems with a leaky gas tank and the economic decline beginning in 2008.

After default, Karapet had the dismissal of the state court case set aside and submitted the stipulation for entry of judgment. At a hearing on November 2, 2010, the state court "accepted" the stipulation and entered judgment without making any independent findings of fraud. Although Michael and his counsel appeared at the hearing, what occurred there is unclear from the record, but there is no evidence Michael testified or that he or his counsel spoke at the hearing. The judgment anticipated liquidating the amount owed under the settlement by an arbitration process that took place the next month. In that arbitration, Karapet argued to the arbitrator that he had an additional 18.5 year life expectancy. To explain the discrepancy between what he told the immigration authorities about his imminent death and the arbitrator about his good health, Karapet testified at trial: "My brain is a computer. I can figure out that." The arbitrator entered an award of $562,559 that was affirmed by the state court in an amended judgment entered on January 25, 2011. No findings of fraud were made in the arbitration award, either. Rather, the dispute was described as for "Breach of contract and other related causes of action."

Michael testified he was not aware that the judgment was for fraud until the nondischargeability action was filed. He considered the action to be for breach of the SRA that he always intended to perform under, and did perform under, until he encountered financial difficulties. Michael testified he only defended the state court suit initially because the complaint demanded more than what was owed under the SRA. There was no evidence that the fraud component of the stipulated judgment was ever discussed with Michael, although there is evidence that the parties' attorneys discussed this issue. The Court notes Michael's relationship with his state court counsel was frayed by the time of the settlement.

Michael filed for bankruptcy relief under chapter 7 on September 14, 2012, and then

Karapet timely filed this adversary proceeding, alleging four causes of action for denial of discharge pursuant to 11 U.S.C. § 727[2] and one for willful and malicious injury under § 523(a)(6) based upon the fraud admission of the stipulated judgment. The parties did no discovery and were unable to successfully mediate the matter. At the pretrial hearing, Karapet abandoned his § 727 claims and sought to amend his complaint to include a § 523(a)(2) claim based on the stipulated judgment, which the Court permitted, since this claim was based on identical facts as the original complaint.

The Court's pretrial order required all testimony to be presented by declaration, subject to cross examination. It also required briefing on the preclusive effect of the state court judgment because Karapet had raised the issue in his complaint. Trial began and concluded on February 12, 2014. When Karapet testified at trial he lacked personal knowledge of all of his declaration's content, the Court struck it from the record, but gave Karapet an opportunity to present his case in chief thereafter.

### III. *CONCLUSIONS OF LAW—PRECLUSION*

■ Although the Latin terms "res judicata" and "collateral estoppel" have historically been used to describe preclusion principles generally, in modern usage these terms have been retitled and their distinct meanings emphasized. "Res judicata" is now referred to as claim preclusion, and "collateral estoppel" is referred to as issue preclusion. The California Supreme Court in *Lucido v. Superior Court*, 51 Cal.3d 335, 341 n. 3, 272 Cal.Rptr. 767, 795 P.2d 1223 (Cal.1990), recognized the doctrines were sometimes used imprecisely

because the "doctrine of collateral estoppel is one aspect of the concept of res judicata." Technically, "claim preclusion" prevents relitigation of the same primary right in a second suit between the same parties or parties in privity with them, while "issue preclusion" precludes relitigation of issues argued and decided in prior proceedings among these parties. *Mycogen Corp. v. Monsanto Co.*, 28 Cal.4th 888, 896, 123 Cal.Rptr.2d 432, 51 P.3d 297 (Cal. 2002) (California law); *see also Taylor v. Sturgell*, 553 U.S. 880, 892, 128 S.Ct. 2161, 171 L.Ed.2d 155 (2008) (federal law).

The Court's preclusion analysis will focus on California law where Karapet's fraud judgment arose. *See Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 482, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982) (the full faith and credit statute looks to the genesis of the judgment to determine what law to apply); *White v. City of Pasadena*, 671 F.3d 918, 926–27 (9th Cir.2012) (same). The Court will apply each of these preclusion concepts to the stipulated judgment here.

### A. CLAIM PRECLUSION

■ Claim preclusion generally applies to compromise judgments under California law since the settlement extinguishes the specific causes of action between the parties. *See Travelers Indem. Co. v. State Farm Mut. Auto. Ins. Co.*, 330 F.2d 250, 262 (9th Cir.1964) (a compromise judgment "extinguishes the particular cause of action which the parties were settling" but does not extinguish other claims between parties); *Taylor v. Hawkinson*, 47 Cal.2d 893, 895, 306 P.2d 797 (1957) (the parties' compromise judgment "constitutes a bar to any further prosecution of their original claims"). In *California State Auto. Assn.*

---

**2.** References to statutory sections for the remainder of this decision will refer to the United States Bankruptcy Code, Title 11 United States Code, unless otherwise noted.

*Inter–Ins. Bureau v. Superior Court,* 50 Cal.3d 658, 664 n. 2, 268 Cal.Rptr. 284, 788 P.2d 1156 (1990) ("*CSAA* "), the California Supreme Court relied on *Travelers,* 330 F.2d at 262, and *Taylor,* 47 Cal.2d at 896, 306 P.2d 797, to hold that a consent judgment between an insurer, the insured and the plaintiff determining liability and damages barred the new claim as a matter of "collateral estoppel." Despite this reference to "collateral estoppel" [3] the analysis of the case was actually of claim preclusion, because the holding barred relitigation between the insurer and insured on the issue of liability because the parties were determined to have intended this outcome in their stipulation. *CSAA,* 50 Cal.3d at 664, 268 Cal.Rptr. 284, 788 P.2d 1156.

■ Although claim preclusion could conceivably apply if a second fraud suit were to be brought by Karapet, it does not apply in this nondischargeability case. *Brown v. Felsen,* 442 U.S. 127, 139, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979). Nondischargeability claims are separate from the fraud and breach of contract claims resolved by a stipulated judgment. *Garner,* 498 U.S. at 284, 111 S.Ct. 654. Determining nondischargeability of debts is also the exclusive province of this Court, which must look behind a state court settlement to determine if the underlying debt arose from fraud. *See Archer v. Warner,* 538 U.S. 314, 323, 123 S.Ct. 1462, 155 L.Ed.2d 454 (2003) (creditor's settlement judgment is not a novation obviating the bankruptcy

court's independent assessment of dischargeability).

**B. ISSUE PRECLUSION**

■ Unlike claim preclusion, issue preclusion may apply to a dischargeability claim. *See Garner,* 498 U.S. at 284 n. 11, 111 S.Ct. 654 ("We now clarify that collateral estoppel principles do indeed apply in discharge exception proceedings pursuant to § 523(a)."). Six criteria must be met for issue preclusion to apply to a California judgment under *Lucido,* 51 Cal.3d at 341–43, 272 Cal.Rptr. 767, 795 P.2d 1223:(1) the issue "must be identical to that decided in a former proceeding"; (2) it "must have been actually litigated in the former proceeding"; (3) it "must have been necessarily decided in the former proceeding"; (4) "the decision in the former proceeding must be final and on the merits"; (5) "the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding"; and (6) application of issue preclusion must be consistent with the public policies of "preservation of the integrity of the judicial system, promotion of judicial economy, and protection of litigants from harassment by vexatious litigation." Whether the elements of issue preclusion are met is a factual issue on which Karapet has the burden to "introduce a record sufficient to reveal the controlling facts and pinpoint the exact issues litigated in the prior action." *Kelly v. Okoye (In re Kelly),* 182 B.R. 255, 258 (9th Cir. BAP 1995); *Berr v. FDIC (In re Berr),* 172 B.R. 299, 306 (9th Cir. BAP 1994). This burden is made

**3.** The reference to "collateral estoppel" in *CSAA* was likely a reference to the subset of claim preclusion mentioned in *Lucido,* 51 Cal.3d at 341 n. 3, 272 Cal.Rptr. 767, 795 P.2d 1223, because *CSAA* relied upon the classic definition of claim preclusion identified in *Taylor,* 47 Cal.2d at 896, 306 P.2d 797, to bar the insurer's attempt to relitigate the issue of liability. As interpreted by later

cases, the effect of *CSAA* on the issue preclusion analysis for consent judgments is to require that the intent of consent judgments be assessed. *Tennison v. Cal. Victim Comp. & Gov't Claims Bd.,* 152 Cal.App.4th 1164, 1176–77, 62 Cal.Rptr.3d 88 (1st Dist.2007). The Court does so in the issue preclusion section of this decision.

weightier by the presumption against applying issue preclusion in nondischargeability cases. *Honkanen v. Hopper (In re Honkanen)*, 446 B.R. 373, 384 (9th Cir. BAP 2011).

Taking the issue preclusion elements in turn, the first (identical issue) is met because fraud and nondischargeability under § 523(a)(2)(A) have identical elements. *Younie v. Gonya (In re Younie)*, 211 B.R. 367, 374 (9th Cir. BAP 1997), *aff'd*, 163 F.3d 609 (9th Cir.1998). The fourth (decision is final) and fifth (same parties) elements are undisputed. The second (actually litigated), third (necessarily litigated) and sixth (public policy concerns) elements remain to be analyzed to determine if the stipulated judgment should have issue preclusive effect.

█ In California, compromise settlements entered under Cal.Code Civ. Pro. § 998 do not have issue preclusive effect because they are not the product of actual litigation, and factual issues germane to the merits are not determined by the court. *See Eichman v. Fotomat Corp.*, 759 F.2d 1434, 1437 (9th Cir.1985) (finding no preclusive effect in the context of a Cal. Code Civ. Pro. § 998 settlement). As stated in *Milicevich v. Sacramento Medical Center*, 155 Cal.App.3d 997, 1004, 202 Cal. Rptr. 484 (Cal.App.3d Dist.1984) (internal citations and quotations omitted):

> "Compromise" connotes mutual concessions; it reflects the settling parties' temporal resolution of the risks of suit as between them. A compromise agreement does not as such constitute an adjudication of either liability or damages. The language "compromise settlement" makes it clear that the element of litigated issues is absent, and that the judgment cannot be used as a collateral estoppel.

Even outside of the Cal.Code Civ. Pro. § 998 context, the inability of consent judgments to satisfy the *Lucido* actual and necessary elements has resulted in these judgments being denied issue preclusive effect. *See Tennison*, 152 Cal.App.4th at 1176–77, 62 Cal.Rptr.3d 88 (stipulation of factual innocence created "serious doubts" that the issue was necessarily litigated and should not bar a later compensation claim due to lack of any evident intent to affect the later proceeding as required by *CSAA*, 50 Cal.3d at 664, 268 Cal.Rptr. 284, 788 P.2d 1156); *Landeros v. Pankey*, 39 Cal. App.4th 1167, 1172, 46 Cal.Rptr.2d 165 (2d Dist.1995) (warranty of habitability claims not barred in a stipulated judgment for possession in an unlawful detainer action since they had not been litigated and were outside the intent of the stipulation, applying *CSAA*, 50 Cal.3d at 664, 268 Cal.Rptr. 284, 788 P.2d 1156).

█ The only intent of the stipulated judgment here was to deem Michael's debt to Karapet nondischargeable in a future bankruptcy. Even if this intent could satisfy the second and third elements of California issue preclusion (if applicable despite the holding of *CSAA*, 50 Cal.3d at 664, 268 Cal.Rptr. 284, 788 P.2d 1156 actually applying to claim preclusion), this intent would fail the sixth public policy element of the *Lucido*, 51 Cal.3d at 341, 272 Cal.Rptr. 767, 795 P.2d 1223, test. Waivers of discharge are not consistent with public policy. *See Continental Ins. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.)*, 671 F.3d 1011, 1026 (9th Cir. 2012) (prepetition waivers of bankruptcy protections unenforceable in plan confirmation litigation); *Bank of China v. Huang (In re Huang)*, 275 F.3d 1173, 1177 (9th Cir.2002) (waiver of discharge provision unenforceable); *Hayhoe v. Cole (In re Cole)*, 226 B.R. 647, 651–55 (9th Cir. BAP 1998) (discharge waivers violate public policy to provide a debtor a fresh start).

The record before this Court does not establish that the stipulation was intended to establish fraud for any reason other than waiver of discharge. The stipulation had no intended impact outside of a future bankruptcy since the state court action was dismissed until Michael defaulted. No findings of fraud of any kind were made by the state court in any event. The initial and the amended judgment entered by the state court passively accepted the stipulation, rather than adopting the facts in the stipulation. The arbitrator, when calculating damages, made no fraud findings, and in fact described the case as primarily a breach of contract action. The fraud referenced in the stipulation was conclusory and devoid of any details of the elements of fraud, particularly reliance and intent to deceive. *See Britton v. Price (In re Britton)*, 950 F.2d 602, 604 (9th Cir.1991) (listing elements of fraud). This lack of detail in the stipulation establishes that there are insufficient facts of fraud for the state court to have made the necessary findings had it tried to do so. *See Cole*, 226 B.R. at 655 (conclusion of fraud not sufficiently detailed to apply issue preclusion). Michael did not testify nor admit to fraud in state court, and then he credibly proved a contrary intention supported by his payment history in his testimony in this Court. *See Wank v. Gordon (In re Wank)*, 505 B.R. 878, 888–89 (9th Cir. BAP 2014) (fraud admission in unfiled declaration supporting a consent judgment could not sustain summary judgment on a non-dischargeability action). *Cf. Son v. Park*, 2010 WL 4807089, at *6–7, 2010 U.S. Dist. LEXIS 123068, at *19–20 (N.D.Cal. Nov. 18, 2010) (detailed testimony by debtor of fraud in state court supported grant of summary judgment).

 Because the state court judgment was not a default judgment but instead arose from a stipulation, the Court cannot independently infer that the state court made findings of fraud that are missing from the record. Such an inference may be appropriate to afford issue preclusive effect to a default judgment based only on fraud, *Younie*, 211 B.R. at 374, but not with a stipulated judgment. There are different procedural bases for each type of judgment. A default judgment requires the state court judge to independently review the evidence including admissions to ensure each element is satisfied. *See Harbour Vista, LLC v. HSBC Mortgage Services Inc.*, 201 Cal.App.4th 1496, 1503 n. 6, 134 Cal.Rptr.3d 424 (4th Dist.2011) (trial court may only enter default judgment after plaintiff produces evidence establishing prima facie case). As is clear from the state court merely "accepting" the stipulated judgment, its role is more limited than in the default context. *See Conservatorship of McElroy*, 104 Cal.App.4th 536, 544, 128 Cal.Rptr.2d 485 (4th Dist.2002) (court's role is to ensure clear settlement terms understood by the parties); *Viejo Bancorp, Inc. v. Wood*, 217 Cal.App.3d 200, 209 n. 4, 265 Cal.Rptr. 620 (4th Dist. 1989) (court's power to make factual determinations is "generally limited to whether the parties entered into a valid and binding settlement agreement"). Because California stipulated judgments are not based upon independent findings of the elements of the claim, these findings cannot be inferred.

## IV. CONCLUSIONS OF LAW—FRAUD CLAIMS

### A. Section 523(a)(2) Claim

 The elements of fraud to be proven by a preponderance of the evidence to establish a § 523(a)(2)(A) cause of action are: (1) the debtor made representations; (2) he knew that the representations were false at the time they were made; (3) the representations were made with the inten-

tion and purpose of deceiving the creditor; (4) the creditor relied on the representations; and (5) the creditor sustained the alleged loss and damage as the proximate result of the representations having been made. *Eugene Parks Law Corp. Defined Benefit Pension Plan v. Kirsh (In re Kirsh)*, 973 F.2d 1454, 1457 (9th Cir.1992). "[F]raudulent intent may be established by circumstantial evidence, or by inferences drawn from a course of conduct." *Devers v. Bank of Sheridan (In re Devers)*, 759 F.2d 751, 753–54 (9th Cir.1985).

 The fraud alleged here is that Michael guaranteed the SRA, including the due on sale provision, without intending to perform it, inducing Karapet to give up his business for a lifetime of support payments that Michael planned to stop when Karapet was ill and facing prison. These allegations, if proven, could have resulted in the debt being nondischargeable. *See McCrary v. Barrack (In re Barrack)*, 217 B.R. 598, 606–07 (9th Cir. BAP 1998) (false promise to provide security for a loan resulted in nondischargeable judgment). The intention not to perform must be present when the agreement is formed; otherwise only a breach of contract is proven. *See Rubin v. West (In re Rubin)*, 875 F.2d 755, 759 (9th Cir.1989) ("[A] promise made with a positive intent not to perform or without a present intent to perform satisfies § 523(a)(2)(A)."); *Strominger v. Giquinto (In re Giquinto)*, 388 B.R. 152, 166 (Bankr.E.D.Pa.2008) (explaining that "failure to perform as promised, standing alone, gives rise to a case for breach of contract, not actionable fraud."). Karapet here only proved a dischargeable breach of contract.

Karapet conceded that the SRA was negotiated in connection with his divorce in the fall of 2002, which was not a time Karapet was particularly vulnerable as established by the chronology of the events.

When the SRA became effective at year end 2002, Karapet had not yet burned down the family home, leaving him facing prison. The SRA was signed before Karapet injured himself or became hospitalized. Michael also performed under his guarantee for many years until that became impossible as reflected by the extensive history of payments and other support provided to Karapet: lodging in 2002; $24,000 and health insurance in 2003; care packages, cash, and a watch while Karapet was in custody; moneys to "Chris;" $210,000 paid under the settlement; and $72,000 for two years thereafter. Ultimately, the total paid under the SRA was more than $320,000. These payments support a benign intent rather than fraud. *See Anastas v. Am. Savings Bank (In re Anastas)*, 94 F.3d 1280, 1287 (9th Cir. 1996) (partial payment supports no intent to defraud). Karapet received much of what he was promised over time, and in accordance with his dishonest preferences.

The Court concludes Karapet failed to prove intent to deceive or a false promise; each a necessary element of Karapet's § 523(a)(2)(A) claim.

### B. SECTION 523(A)(6) CLAIM

 Karapet relied on the same fraud in the inducement claims to support his § 523(a)(6) cause of action, alleging Michael's alleged fraud caused him "willful and malicious injury." The "willful" element requires the debtor has a subjective intent to harm or the subjective belief that harm is substantially certain. *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1144–45 (9th Cir.2002). The "malicious" element requires that a debtor's intentional injurious act was also without just cause or excuse. *Id.* at 1146–47. Debts incurred by fraud are not necessarily willful and malicious injury. *See Mills v. Gergely (In re Gergely)*, 110 F.3d 1448, 1451 (9th Cir.1997) (debt from performing an amniocentesis

does not constitute willful and malicious injury but remanded on the issue of fraud). But despite the differences between the two causes of action, the same facts constituting fraud may separately support a § 523(a)(6) cause of action for willful and malicious injury. *Romesh Japra, M.D., F.A.C.C., Inc. v. Apte (In re Apte)*, 180 B.R. 223, 231 (9th Cir. BAP 1995).

■ As explained above, Karapet did not establish that Michael initially guaranteed or later breached the SRA with the intent to injure him. To the contrary, the facts establish that Michael helped his father in myriad ways during Karapet's imprisonment and health problems. There is no credible evidence that Michael had the subjective intent to harm. Absent this necessary element, the Court need not address whether Michael's conduct in stopping payment under the SRA was malicious. The Court nevertheless finds Michael did not act with malice: Michael breached the SRA because his gas station business in Los Angeles failed, leaving him unable to make payments to his father. The Court cannot find malice because the injury to Karapet caused by Michael's breach was neither deliberate nor intentional as required by *Kawaauhau v. Geiger*, 523 U.S. 57, 61–62, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998).

Karapet has also failed to prove his § 523(a)(6) claim for fraud.

## V. CONCLUSION

Karapet has neither proven his case for fraud nor the preclusive effect of the stipulated judgment. Accordingly, judgment will be entered in Michael's favor on all grounds. Michael is to lodge a judgment consistent with this decision within ten days.