Filed 11/17/21  White v. Cal. Victim Compensation Board CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| DE'WANN WESLEY WHITE, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CALIFORNIA VICTIM COMPENSATION BOARD, <br><br> Defendant and Respondent. | B305678 <br><br> (Los Angeles County Super. Ct. No. 19STCP02070) |

APPEAL from a judgment of the Superior Court of Los Angeles County, James Chalfant, Judge.  Affirmed.

Kravis, Graham & Zucker and Thomas Ian Graham for Plaintiff and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Michael A. Canzoneri, Supervising Deputy

Attorney General, and Barton Bowers, Deputy Attorney General for Defendant and Respondent.

_____

After this court reversed for insufficient evidence De'Wann Wesley White's 2012 conviction for aiding and abetting the murder of Maurillo Ponce (*People v. White* (May 11, 2015, B249633) [nonpub. opn.]), White filed a claim for wrongful incarceration with the California Victim Compensation Board pursuant to Penal Code section 4900.[1]  The Board denied the claim, finding White had failed to establish he was innocent of the crime with which he had been charged.  The superior court denied White's petition for a writ of administrative mandamus to set aside the Board's decision.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *Ponce's Murder and White's Trial*

Ponce's body was found in a rural area of Lancaster in the early morning of October 7, 2008.  He had been shot multiple times, and bruises on his body were consistent with having been kicked or stomped while still alive.  Five nine-millimeter bullet casings and one expended nine-millimeter bullet, likely fired from a semiautomatic handgun, were found nearby.  No other physical evidence related to the crime was recovered at the scene.  The murder weapon was never found.

Three men were ultimately charged with the murder, White, Anthony Wayne Smith and Charles Honest.  The prosecutor's theory was that Smith had arranged for the three men to meet with and kill Ponce in the Lancaster area.  Smith

_____

[1]     Statutory references are to this code.

2

was believed to be the actual killer, aided and abetted by Honest and White.

In a joint trial before separate juries, Honest was convicted of second degree murder as a direct aider and abettor; Smith's jury was unable to reach a verdict and a mistrial was declared. Honest's conviction was reversed by this court for insufficient evidence. (*People v. Honest* (Sept. 30, 2104, B242979) [nonpub. opn.].) At a retrial Smith's jury was again unable to reach a verdict on the charge of murdering Ponce but convicted him of three unrelated murders.

At his separate trial White was convicted of first degree murder on a direct aiding and abetting theory and sentenced to an indeterminate state prison term of 25 years to life. We reversed the conviction, agreeing with White the trial court had erred in denying his section 1118.1 motion for acquittal at the conclusion of the People's case-in-chief. The evidence of White's involvement in the murder, which we reviewed when reversing the conviction, consisted in large part of cell phone data that linked Smith, Honest, White and Ponce; White's statements during police interrogation; and comments made by White and his wife during a recorded telephone conversation while White was in custody.

Ponce, who lived in Lancaster, was self-employed as a truck mechanic and, using his commercial driver's license, also worked side jobs making truck deliveries. On the evening of October 6, 2008 Ponce borrowed his wife's SUV, explaining to her he was meeting someone named Tony near Santa Clarita or Valencia. Ponce left his home around 11:00 p.m. His wife called his cell phone several times later that night, initially getting no answer and then around 2:00 a.m. a busy signal.

3

Law enforcement learned from Ponce's cell phone call records that Ponce received a call around 11:00 p.m. the night of his death from a prepaid cell phone, registered with a false name and address, that was determined to be owned by Smith. The SUV Ponce had been driving the night of his murder was found in Smith's assigned space in the parking structure for Smith's apartment complex. Smith was in possession of the vehicle's keys when he was arrested. No fingerprints or other physical evidence connected White to the SUV. Firearms, nine-millimeter ammunition and an empty ammunition magazine for a handgun were found in Smith's apartment, but no nine-millimeter handgun.

The Los Angeles County Sheriff's Department began investigating White after deputies discovered a cell phone registered to White's business had exchanged several calls with Smith's and Honest's cell phones shortly before and after Ponce's death.

In his initial interview with sheriff's detectives in May 2010, White acknowledged he and Honest had worked together as longshoremen for several years. White initially denied working jobs with Honest and also said he was not familiar with the Lancaster area. He specifically denied being in Lancaster around 1:00 a.m. on October 7, 2008. He then said the only reason he would have been in Lancaster that night would have been to meet girls and denied ever being in Lancaster with Honest.

After being told Honest had recently been arrested on suspicion of murder, White said he may have heard from Honest about a job moving cargo in Lancaster on October 6, 2008. He denied Smith was involved. After detectives showed White records showing his cell phone had received calls from Smith's

4

cell phone on October 5, 2008, White initially said he thought the calls were coming from Honest to discuss the potential job. He then admitted he knew Smith (but explained he was not as close with Smith as he was with Honest). White said he learned the job had fallen through during the late evening of October 6, 2008 or early morning of October 7, 2008 after he had arrived in Lancaster. He met Honest by an off-ramp of State Route 14 (SR-14, the Antelope Valley Freeway). Honest seemed upset but did not say why the job had been cancelled. In a subsequent interview in March 2011 White admitted the Lancaster job involved transporting stolen goods and said, when he met with Honest off SR-14, there was a male passenger in the truck Honest was driving.

After his initial interview with investigators White spoke to his wife in a recorded telephone call from jail. At one point his wife asked, "What are they charging you for?" White responded, "They, they trying to charge me with the murder, but, I don't know, he, he said that . . . he's going to check the DNA and if the DNA don't match than [*sic*] he's going to cut me loose tomorrow." A moment later White's wife asked, "You protect yourself when you eat, correct?" White responded, "Yeah. I'm all right. I'm all right." His wife continued, "No. But I know you always clean up after you eat." White replied, "Yeah." His wife persisted, "Correct?" And White assured her, "Baby. Yeah."

The People's cell phone expert opined at trial regarding the location of White's, Smith's, Honest's and Ponce's cell phones leading up to and following Ponce's death based on records from the men's cell phone networks. The lead investigator from the sheriff's department, Detective Robert Gray, provided a narrative

5

concerning the likely movement of the cell phones on October 6 and 7, 2008.

Smith called White twice during the afternoon of October 5, 2008. Detective Gray testified based on the phone records White's phone was near Honest's house in South Los Angeles around 9:00 or 9:15 p.m. on October 6, 2008 and then moved toward Smith's apartment in Marina del Rey around 9:45 p.m. Shortly after 11:00 p.m. Smith's and Honest's phones travelled north along Interstate 405 and Interstate 5 to SR-14 in Santa Clarita. Around 11:07 p.m. Ponce's phone was still at his house when he received a call from Smith's phone. At 11:43 p.m. Smith's phone made another call to Ponce's phone. Detective Gray opined Ponce's phone had travelled south on SR-14 away from Ponce's home. Smith's phone had not moved.

At 12:53 a.m. on October 7, 2008 Ponce's phone made a call that indicated it was travelling north back toward Lancaster on SR-14. At 1:03 a.m. White's phone called Honest's phone; both phones connected to the same cell tower in Lancaster, which was approximately eight miles from the location where Ponce's body was found. White's phone again called Honest's phone a few minutes later. White's phone had not moved, but Honest's phone had connected during the call to a cell tower one mile closer to the murder scene.

At 2:02 a.m. Ponce's phone received a call and connected with a cell tower located near SR-14 and Red Rover Mine Road in Acton. At 2:04 a.m. one of Honest's two phones called his second phone, which connected to the same tower as Ponce's call two minutes earlier. Detective Gray opined that someone drove Ponce's SUV, which likely contained Ponce's cell phone, from the crime scene. The detective believed Smith and Honest were

communicating with each other through Honest's phones, while one drove Ponce's SUV.

Thereafter, according to Detective Gray, White's phone travelled south in the same direction as Smith's and Honest's phones but several miles behind them. White's phone called Honest's again at 2:30 a.m. and once more at 3:00 a.m. when White's phone was in Inglewood. Based on the phones' locations during this period, Gray opined they were in the vicinity of Lake Balboa and the Sepulveda Basin Wildlife Reserve in Sherman Oaks. The phones contacted each other several more times during the early morning hours. Honest's phone called Smith's shortly thereafter when both were in Culver City.

Testifying in his defense White explained Honest spoke to him about a possible driving job that involved moving cargo loads and would pay $5,000. Honest gave White the phone number for an individual Honest identified as "T." On October 5, 2008 "T" called White and said the job would happen in Lancaster at 12:30 or 1:00 a.m. Honest would provide additional details. The following evening White got lost while driving toward Lancaster. He contacted Honest, who told him to wait for a call back. White and Honest ultimately met on the side of SR-14 near Santa Clarita. Honest told him that "shit was bad" and there was no job. White called Honest later to see if there was any more information. He denied seeing Ponce, killing him or knowing who did. When asked about the recorded telephone call with his wife, White testified they were discussing the fact they had oral sex the morning of his arrest.

2. *Reversal of White's Conviction on Appeal*

In this court's opinion reversing White's conviction for insufficient evidence (*People v. White*, *supra*, B249633), we

7

emphasized the prosecutor at White's trial argued only that White had directly aided and abetted Ponce's murder. The People did not assert White was guilty of felony murder (committed during a robbery) or murder as the natural and probable consequence of a different target offense (assault). Because the issue on White's direct appeal was whether the trial court had erred in denying his section 1118.1 motion at the close of the People's case-in-chief, we did not consider any evidence presented during White's defense (including White's testimony). The cell phone evidence and White's statements during his interrogation and to his wife in their recorded telephone conversation were insufficient, we held, even when viewed in the light most favorable to the prosecution, to prove White intended to kill Ponce or knowingly and intentionally facilitated the perpetrator's killing of Ponce.

We explained the cell phone evidence and White's inconsistent statements to investigators indicated White was in communication with Honest, met with Honest and perhaps Smith and traveled from the general area of the crime in the same direction and at the same time as Honest and Smith and thus supported a reasonable inference White was present at the scene of Ponce's murder, but not that he intended to kill Ponce or knowingly aided and abetted the murder. White's reference to "the murder" in his call with his wife arguably supported the inference he knew of Ponce's murder because of his interactions with Honest and Smith on October 6 and 7, 2008, rather than because of the questioning by sheriff's detectives, as the Attorney General argued. But that, too, did not provide any affirmative evidence concerning White's mental state leading up to Ponce's murder. Similarly, disbelief of White's statements concerning his

8

lack of involvement in any activity in Lancaster on the night of the murder (which he thereafter contradicted) did not constitute evidence of his actual participation in the murder.

Finally, we rejected the Attorney General's argument that, even if the evidence of White's role as a direct aider and abettor was insufficient, substantial evidence supported his conviction under the natural and probable consequences doctrine as an aider and abettor of a lesser offense that culminated in Ponce's death. That theory was not at issue at trial, we reiterated, and could not be the basis for affirming his conviction on appeal.[2]

3. *White's Section 4900 Petition*

White filed a claim for compensation for wrongful conviction and incarceration pursuant to section 4900 in August 2016.[3] In support of his claim White presented this court's opinion reversing his conviction and a declaration under penalty of perjury from Smith stating Smith and White barely knew each other, Smith had a deal with Ponce to move a load of stolen goods that did not go through, White had come to Lancaster on the night of the murder to assist Smith with transporting the goods, Smith never met White the night of the murder, and, to the best of Smith's knowledge, White had never met Ponce and had nothing to do with his death. White also noted that no physical evidence connected him to Ponce's murder or to the stolen SUV

---

[2] We filed our opinion reversing White's conviction on May 11, 2015. The remittitur issued July 14, 2015. White was released from prison on August 6, 2015.

[3] White requested $226,240 in compensation for 1,616 days of wrongful incarceration.

and that the People acknowledged that Smith was Ponce's actual killer.

The Attorney General opposed the petition, contending White failed to carry his burden of demonstrating his innocence by a preponderance of the evidence. The opposition papers argued White had provided little, if any, affirmative evidence of his innocence, relying primarily on this court's reversal of his murder conviction, and asserted Smith was not a credible witness regarding White's role in Ponce's death.

A contested hearing was held on August 1, 2017 before a Board hearing officer. The Attorney General stipulated White had sustained pecuniary injury as a result of his erroneous conviction and incarceration. The only contested issue was whether White had established he had not committed the murder with which he had been charged.

White's hearing was held jointly with the hearing for a compensation claim filed by Honest. Both men testified; each denied any involvement in Ponce's murder. White's testimony was essentially the same as his testimony at trial, including his denial that he had been present at the murder scene. He acknowledged he had no additional evidence of his innocence. Honest testified he hoped to make several thousand dollars from the job moving cargo the night of October 6, 2008. He drove by himself to the Lancaster area in Smith's truck. Honest said he did not know if Smith was involved with the murder, but suggested it did not make sense for Smith to take Ponce's SUV if he were.

4. *The Board's Decision*

The hearing officer issued a proposed decision on February 16, 2018 denying White's compensation claim, finding

10

he had failed to carry his burden of proving his innocence. The hearing officer explained she had "carefully considered White's denial and the Court of Appeal's decision; however, they are not sufficient alone to warrant a recommendation for compensation absent substantial independent corroborating evidence that White is innocent of murder."

White filed written objections to the proposed decision, and the Board ordered a further hearing to permit the parties to brief several issues, including what, if any factual or legal determinations in this court's opinion were binding on the Board and whether White's application could be denied under an alternative theory of guilt (felony murder or the natural and probable consequences doctrine) that had not been presented at trial.

In a January 29, 2019 proposed decision upon reconsideration a new hearing officer again denied White's claim. The hearing officer determined our findings relating to the evidence at trial were binding—in particular, that there was insufficient evidence to establish White aided and abetted the murder and also that a jury could reasonably infer that White was present at the scene of Ponce's murder—but those findings did not preclude the conclusion that White had failed to demonstrate his actual innocence of Ponce's murder. The hearing officer also concluded, because White was charged with murder as a nonspecific violation of Penal Code section 187, subdivision (a), to be entitled to compensation he bore the burden of demonstrating his innocence of that murder under any legal theory that could support the charge, which included, prior to the January 1, 2019 effective date of the Legislature's reform of the law regarding accomplice liability for murder, the natural and

11

probable consequences doctrine and felony murder. White's evidence failed to carry that burden not only with respect to direct aiding and abetting but also as to felony murder committed while Ponce was being robbed of his SUV or murder as the natural and probable consequence of Ponce's assault by White and Honest.

Based on the record before her, the hearing officer stated the evidence indicated Smith had devised a plan to commit some type of criminal act with the assistance of Honest and White on the night of October 6, 2008 in the vicinity of Santa Clarita (the exact nature of the plan remained unknown). Ponce initially may have been a willing participant but perhaps was the intended victim all along. To execute the plan (and consistent with the cell phone records), White drove first to Honest's home in Los Angeles and then to Smith's home in Marina del Rey. Thereafter, the three men traveled to Santa Clarita around 11:00 p.m. and met with Ponce at midnight. All four men then drove north to a remote location in Lancaster. That meeting ended with Ponce beaten and shot to death and his SUV taken by Smith. This court concluded it was a reasonable inference that White's presence at the scene and his "cryptic conversation" with his wife about cleaning up after himself when he ate suggested his direct involvement in the criminal activity rather than merely observing the others. Immediately after the time of Ponce's death, Smith, Honest and White left the area where the crime had occurred. "[T]hese inferences from the administrative record," the hearing officer wrote, "strongly suggest that White is guilty of Ponce's murder. . . . It matters not whether these circumstances rise to the level of demonstrating White's guilt[] beyond a reasonable doubt or by a preponderance because the

12

burden remains upon White to demonstrate by a preponderance, that he did *not* murder Ponce under any of these plausible theories."

As summarized by the hearing officer in the concluding section of her proposed decision, "The inculpating evidence includes White's presence when Ponce was fatally shot five times by Smith and brutally assaulted by Honest. It also includes White's repeated false denials that he was not there, which are indicative of his consciousness of guilt. It further includes White's explanation about his jailhouse conversation with his wife Perez, which revealed not only that White had previously discussed Ponce's murder with Perez, but also that their discussion caused Perez to fear that White's DNA may be discovered. [¶] . . . [¶] All in all, White's exculpatory evidence does not outweigh the incriminating evidence. Specifically, it fails to prove that White is more likely innocent, than guilty, of Ponce's murder. . . . [¶] White repeatedly insists that, because the appellate court found no evidence to show what he was doing the night of Ponce's murder, [the Board] cannot infer that he assaulted, robbed, or murdered Ponce. [Fn. omitted.] Not so. In this proceeding, where White bears the burden of persuasion, the absence of any finding as to what White was doing necessarily opens the door to all possibilities. Absent affirmative proof that none of the plausible scenarios implicating White in Ponce's murder occurred, White has not shown that he is more likely innocent, than guilty, of Ponce's murder. Thus, White has failed to prove his innocence, even if the evidence is insufficient to prove his guilt."

13

On February 25, 2019 the Board adopted the hearing officer's proposed decision upon reconsideration as its decision in the matter.

5. *White's Petition for Administrative Mandamus*

White filed a verified petition for writ of administrative mandate on May 28, 2019, seeking to set aside the Board's decision. White contended the Board denied him a fair hearing by requiring him to disprove theories of murder liability not presented at his trial (and which were eliminated or significantly narrowed by Senate Bill No. 1437 (Stats. 2018, ch. 1015)) and its decision, replete with misstatements and misrepresentations of the record, was not supported by the evidence.

The superior court denied the petition. Although seeming to agree with the Board and the Attorney General that compensation could be denied if White failed to prove his innocence of Ponce's murder under the felony-murder rule, the superior court ruled the issue was moot because White had not shown his innocence under the direct aiding and abetting theory on which the prosecution had relied at trial. The court explained that the Board found, consistent with this court's opinion, White was present at the scene when Ponce was fatally shot by Smith. "Based on this finding, it was up to White to demonstrate why he was there, that he lacked any requisite intent, and/or that he performed no acts to help Smith. . . . [¶] White utterly failed to do so."[4]

---

[4] The Board's analysis of what may have happened based on the circumstantial evidence in the record, the superior court wrote, "while interesting and impressive," was not necessary to its decision, although it did "explain the Board's reasoning and supports its conclusion that White failed to prove his innocence."

14

The superior court specifically addressed six of the Board's findings that White argued were not supported by substantial evidence, noting at the outset that whether they were "is irrelevant because White failed to meet his burden." First, White was present at the murder scene, which implicated him in Ponce's murder. Substantial evidence supported the finding White was at the scene (a reasonable inference according to our appellate decision). Approving that finding did not depend on whether the Board also had sufficient evidence to conclude White was guilty of murder.

Second, White participated in an assault or robbery of Ponce. The superior court agreed with White there was not substantial evidence he assaulted Ponce. But, the court pointed out, the Board did not make that finding, concluding only that it was plausible that he had joined in the attack on Ponce. In any event, White's failure to present evidence of what he was doing when Ponce was murdered was fatal to his claim.

Third, White met with Smith, Honest and Ponce in Santa Clarita prior to Ponce's killing.

Fourth, White stopped between 2:38 a.m. and 2:49 a.m. near Lake Balboa and the Sepulveda Basin Wildlife Reserve, possibly to clean up and/or to dispose of the murder weapon. The court again agreed with White there was not substantial evidence to support these findings, which were part of the Board's speculation as to what actually happened, but these gaps in the narrative did not impact the validity of the Board's conclusion White had failed to carry his burden of proof.

Fifth, based on the conversation between White and his wife, it is reasonable to assume, as the court of appeal did, White knew of Ponce's murder because of his interactions with Smith

15

and Honest. The superior court agreed with White that the Board misstated this court's discussion of the import of the telephone call, but characterized the error as immaterial. The Board was correct, the court stated, that the call showed White's preexisting knowledge of "the murder," not that he had learned for the first time in his interviews with the detectives that someone had been murdered.

Sixth, Smith's declaration was not credible. The Board adequately explained why it found Smith not credible, the court ruled, beginning with his denial of having murdered Ponce when it was undisputed that he had. In addition, Smith had significant reasons to curry favor with White, who could be a favorable witness for Smith if he were to be retried for Ponce's murder. Moreover, Smith's version of events changed over time, and his declaration that he did not meet with either White or Honest on the night of the murder was directly contradicted by Honest's testimony.

In a short conclusion the superior court reiterated that White had not carried his burden: "Contrary to his story, he was at the murder scene at the time of the murder. He fails to show what he did or did not do and why he lacked the requisite intent. The Board's analysis of what may have or probably happened is not necessary to its decision that White is not entitled to compensation."

The superior court entered its judgment denying all relief requested in White's petition on February 14, 2020. White filed a timely notice of appeal.

16

**DISCUSSION**

1. *Standard of Review*

Code of Civil Procedure section 1094.5, the administrative mandamus statute, provides for judicial review of administrative orders or decisions. (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514.) The question presented by a petition for writ of administrative mandate is whether the agency or tribunal that issued the decision being challenged "proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion." (Code Civ. Proc., § 1094.5, subd. (b).) "Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Ibid.*)

On appeal from the judgment on a petition for writ of administrative mandate in a case not involving fundamental vested rights, we review the agency's findings, not the superior court's decision, for substantial evidence. (*Doe v. University of Southern California* (2018) 28 Cal.App.5th 26, 34; *Benetatos v. City of Los Angeles* (2015) 235 Cal.App.4th 1270, 1281; see Code Civ. Proc., § 1094.5, subd. (c) ["abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record"].) White's compensation claim did not involve a fundamental vested right. (See *Madrigal v. California Victim Comp. & Government Claims Bd.* (2016) 6 Cal.App.5th 1108, 1113 ["Madrigal did not have a fundamental vested right to compensation from the Board"]; *Tennison v. California Victim Comp. & Government Claims Bd.* (2007) 152 Cal.App.4th 1164, 1182 (*Tennison*) ["Tennison's

17

application for monetary compensation pursuant to [Penal Code] section 4900 is neither fundamental nor vested"].)  The petitioner in the administrative mandamus proceeding "has the burden of proving that the agency's decision was invalid and should be set aside, because it is presumed that the agency regularly performed its official duty."  (*Desmond v. County of Contra Costa* (1993) 21 Cal.App.4th 330, 335.)

2. *Governing Law:  California's Exonerated Inmate Compensation Statutes*

"California has long had a system for compensating exonerated inmates for the time they spent unlawfully imprisoned."  (*People v. Etheridge* (2015) 241 Cal.App.4th 800, 806; accord, *Larsen v. California Victim Comp. Bd.* (2021) 64 Cal.App.5th 112, 123 (*Larsen*), review granted August 25, 2021, S269406.)  The Board "is vested with the power to recommend to the Legislature that an inmate be compensated if it finds the inmate eligible under the statutory scheme." (*Etheridge*, at p. 806.)

Section 4900 provides any person convicted of a felony and incarcerated as a consequence who is "innocent of the crime with which he or she was charged" because that crime "was either not committed at all or, if committed, was not committed by him or her" may present a claim to the Board "for the pecuniary injury sustained by him or her through the erroneous conviction and imprisonment or incarceration."[5]  (See also § 4904 ["[i]f the

---

[5]     By statute the Board's recommendation for compensation for erroneous conviction is to be a sum equal to $140 per day of incarceration.  (§ 4904.)  "Board recommendations for compensation are just that, recommendations.  Legislators can— and do—vote against bills making appropriations for the

evidence shows that the crime with which the claimant was charged was either not committed at all, or, if committed, was not committed by the claimant, and that the claimant has sustained injury through his or her erroneous conviction and imprisonment, the California Victim Compensation Board shall report the facts of the case and its conclusions to the next Legislature, with a recommendation that the Legislature make an appropriation for the purpose of indemnifying the claimant for the injury"]; *Tennison, supra*, 152 Cal.App.4th at p. 1182 ["a claim for 'pecuniary injury sustained . . . through . . . erroneous conviction and imprisonment' may be presented pursuant to section 4900 if the claimant can show he or she is 'innocent of the crime with which he or she was charged' because it was 'not committed by him or her'"].)

Section 4903, subdivision (a), provides for a hearing before the Board with the burden of proof on the claimant except in specified circumstances not applicable in White's case: "Except as provided in Sections 851.865 and 1485.55, the board shall fix a time and place for the hearing of the claim. At the hearing the claimant shall introduce evidence in support of the claim, and the Attorney General may introduce evidence in opposition thereto. The claimant shall prove the facts set forth in the statement constituting the claim, including the fact that the crime with which they were charged was either not committed at all, or, if committed, was not committed by the claimant, and the injury sustained by them through their erroneous conviction and incarceration." (See Cal. Code Regs., tit. 2, § 644, subd. (c)

---

payment of such claims." (*Larsen, supra*, 64 Cal.App.5th at p. 124, fn. 6, review granted.)

[claimant has burden of proof on all issues necessary to establish eligibility; standard of proof is a preponderance of the evidence].)

   3. *The Evidence Before the Board Did Not Compel a Finding of White's Innocence in the Murder of Ponce*

In this court White argues, as he did in the superior court, that the Board abused its discretion in denying his claim for compensation by requiring him to demonstrate he was innocent of murder under the felony-murder rule and the natural and probable consequences doctrine and by making findings not supported by substantial evidence to reinforce its determination he had failed to demonstrate his innocence of Ponce's murder (the same six findings addressed by the superior court). A fair reading of the administrative record, he insists, supports the conclusion he was in the Lancaster area on the night of Ponce's murder only to assist Honest in moving a load of stolen cargo and, when Honest informed him the job had fallen through, he left the area without ever seeing Ponce or Smith.

We need not address White's first contention. Because, as we discuss, the superior court properly denied White's petition based on the Board's determination he had failed to prove his innocence as a direct aider and abettor of Ponce's murder, any error in also requiring him to establish his innocence under other theories of accomplice liability was necessarily harmless. (See *Thornbrough v. Western Placer Unified School Dist.* (2013) 223 Cal.App.4th 169, 200 ["'A writ of administrative mandamus will not be issued unless the court is persuaded that an abuse of discretion was prejudicial. [Citation.] In other words, the reviewing court will deny the writ, despite abuse of discretion, if the agency's error did not prejudicially affect the petitioner's substantial rights'"]; see also *Quintanar v. County of Riverside*

20

(2014) 230 Cal.App.4th 1226, 1228, 1236 [reversing judgment granting writ of administrative mandate where the hearing officer's use of the wrong standard of review was an abuse of discretion but was not prejudicial because use of the correct standard "would not have changed the outcome"]; *Leal v. Gourley* (2002) 100 Cal.App.4th 963, 968 [a party filing a petition for writ of administrative mandate must show not only error in the agency proceedings but also prejudice resulting from that error—a "miscarriage of justice" as specified in article VI, section 13 of the California Constitution].)  White does not argue to the contrary in either his opening or reply brief.

      White's second contention rests on a fundamental misunderstanding of his burden of proof before the Board and the standard of review governing his petition for writ of administrative mandate.  Compensation requires an affirmative showing of factual innocence, not the absence of evidence of culpability.  (*Tennison*, *supra*, 152 Cal.App.4th at p. 1182; see *Diola v. State Board of Control* (1982) 135 Cal.App.3d 580, 588, fn. 7 ["[T]he board's section 4900 determination is a *civil* determination of culpability.  To prevail claimant must carry the burden of proof of innocence by a preponderance of the evidence"]; *Ebberts v. State Board of Control* (1978) 84 Cal.App.3d 329, 335 ["[w]e interpret the phrase 'not committed at all' in [sections] 4900 and 4903 to mean the claimant can show the board that he was 'innocent' in the sense that he did not do the *acts* which characterize the crime"]; see also *People v. Etheridge*, *supra*, 241 Cal.App.4th at pp. 809-810 [as used in section 1485.55, a finding of "factual innocence" in a habeas corpus proceeding, which is binding on the Board, is intended to have the same meaning as the language used in sections 4900, 4903

21

and 4904 and requires the petitioner to "demonstrate by a preponderance of the evidence that he or she was 'innocent' in the sense that he or she did not perform the acts 'that characterize the crime' or are elements of the crime, and was therefore 'wrongfully convicted and unlawfully imprisoned'"].)[6]

---

[6] Section 1485.55, subdivision (a), provides, "In a contested proceeding, if the court has granted a writ of habeas corpus . . . and if the court has found that the person is factually innocent, that finding shall be binding on the California Victim Compensation Board for a claim presented to the board, and upon application by the person, the board shall, without a hearing, recommend to the Legislature that an appropriation be made and the claim paid pursuant to Section 4904."

Senate Bill No. 446 (2021-2022 Reg. Sess.) amends section 1485.55, subdivision (a), effective January 1, 2022, to provide it applies in both contested and uncontested proceedings and to add the language "under any standard for factual innocence applicable in those proceedings" (which includes habeas proceedings) immediately after the statutory reference to "if the court has found that the person is factually innocent," thus clarifying the applicable circumstance in which the court has made the finding of factual innocence. (Stats. 2021, ch. 490, § 2.) That amendment appears to resolve the conflict between *Souliotes v. California Victim Compensation Board* (2021) 61 Cal.App.5th 73, review granted June 9, 2021, S267930 (which held the federal court's "gateway" finding of actual innocence pursuant to *Schlup v. Delo* (1995) 513 U.S. 298 underlying the grant of habeas relief did not satisfy the factually innocent standard of section 1485.55, subdivision (a)) and *Larsen, supra*, 64 Cal.App.5th 112, review granted (which held the *Schlup* gateway finding, when coupled with the grant of habeas relief, satisfied section 1485.55, subdivision (a), and was binding on the Board).

White admitted he and Honest were engaged in a criminal enterprise the night of Ponce's murder involving the transportation of stolen goods—the type of illegal activity in which Ponce also participated. Smith confirmed he and Ponce discussed transporting stolen goods that evening. Cell phone records show White was in contact with Honest before and after the time of Ponce's murder, Honest was in communication with Smith, and Smith with Ponce. Notwithstanding Smith's denials and two juries' inability to unanimously agree Smith was guilty of the murder beyond a reasonable doubt, there was ample evidence, as White asserts, that Smith, who had possession of Ponce's stolen SUV, was Ponce's actual killer.

As we held in our opinion reversing White's conviction, a jury (or the Board) could reasonably infer from this evidence that White was present at the scene of Ponce's murder. We also held, as White emphasizes, that this foundational inference, even when considered with the prosecution's other evidence, was insufficient to support the further inference (that is, it did not constitute substantial evidence) that White aided and abetted Ponce's murder. But that further conclusion of ours, binding on the Board, still leaves White with the burden of showing he did not directly aid or abet Smith's murder of Ponce: A finding that a

---

The new legislation also modifies sections 4900 through 4904 with respect to Board procedures in cases in which a writ of habeas corpus was granted without a finding of factual innocence and charges were subsequently dismissed or the person acquitted on retrial, placing the burden on the Attorney General to prove the claimant is not entitled to compensation. Senate Bill No. 446's amendments do not affect someone like White whose conviction was reversed on appeal for insufficient evidence.

defendant could not be found guilty beyond a reasonable doubt is not a factual finding that he or she did not commit the crime in question, as required by section 4900. Similarly, the absence of physical evidence connecting White to the crime scene or to Ponce's stolen SUV does not prove White was not at the crime scene. (Cf. *In re Sagin* (2019) 39 Cal.App.5th 570, 581 [the absence of DNA evidence connecting petitioner to the crime scene does not prove he was not present; "[i]t proves only that Sagin's DNA was not on the items tested"].)

As for White's testimony he was not at the crime scene and did not participate in the murder, Honest's testimony regarding the events of the evening, and Smith's sworn declaration that he and White did not meet the night of Ponce's murder and, to Smith's knowledge, White was not involved in the crime— arguably new evidence supporting White's claim of innocence— the Board disbelieved those three witnesses. It is not our role to reweigh credibility determinations. (See *Do v. Regents of University of California* (2013) 216 Cal.App.4th 1474, 1492; *Kolender v. San Diego County Civil Service Com.* (2005) 132 Cal.App.4th 1150, 1155; see also *In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 979 [the trier of fact "may reject any evidence as unworthy of credence, even uncontradicted testimony"]; accord, *Hicks v. Reis* (1943) 21 Cal.2d 654, 659 ["[t]he trier of the facts is the exclusive judge of the credibility of the witnesses"].) Even so, the Board had ample reason to discredit their claims. None was a disinterested witness: White and Honest had claims for compensation pending before the Board, and Smith remained at risk for prosecution for Ponce's murder. Each gave conflicting versions of the evening's events at various times, and provided stories that were inconsistent with

the records of their cell phone calls and later admissions. White, in particular, during his initial police interrogation falsely denied ever being in Lancaster, doing any work with Honest or even knowing Smith.

As the superior court explained (and the Attorney General argues on appeal), it is immaterial that aspects of the Board's narrative as to White's likely role in the events of the evening and, in particular, what he may have done while present at the crime scene, require conjecture not supported by the administrative record. That we do not know what occurred, however, is not determinative given section 4903's allocation to the claimant of the burden of proving he or she did not commit the crime charged. The absence of reliable evidence of his actual innocence—not the existence of evidence of his guilt—foreclosed White's claim. (Cf. *Larsen*, *supra*, 64 Cal.App.5th at p. 127, review granted [a credible "gateway" claim of actual innocence in a federal habeas proceeding requires "'new reliable evidence— whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial'"].)

Indeed, because it was White's burden to prove his innocence by a preponderance of the evidence and the Board found he failed to carry that burden, the proper formulation of the standard of review is whether "'the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding."'" (*Juen v. Alain Pinel Realtors, Inc.* (2019) 32 Cal.App.5th 972,

25

978-979; see *In re R.V.* (2015) 61 Cal.4th 181, 201 [where party fails to carry its burden on an issue, "the inquiry on appeal is whether the weight and character of the evidence . . . was such that the [finder of fact] could not reasonably reject it"].)  The evidence in the administrative record falls far short of meeting that extremely demanding standard.

## DISPOSITION

The judgment of the superior court is affirmed.  The parties are to bear their own costs on appeal.


PERLUSS, P. J.

We concur:


SEGAL, J.


FEUER, J.